# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| LARRY MAYES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:03-CV-379-PRC |
| | ) | |
| CITY OF HAMMOND, INDIANA, FORMER | ) | |
| POLICE CHIEF FRANK DUPEY, DETECTIVE | ) | |
| SGT. RAYMOND MYSZAK, DETECTIVE | ) | |
| MICHAEL SOLAN, and JOHN and JANE DOES | ) | |
| 1 through 50, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on (1) Defendants' Motion to Strike the Plaintiff's Response Brief to the Defendants' Motion for Summary Judgment and the Plaintiff's "Appendix A" [DE 190], filed by Defendants City of Hammond ("City") and John and Jane Does 1 through 50 on May 4, 2006; (2) Defendant Detective Sgt. Raymond Myszak's Motion to Strike the Plaintiff's Response Brief to Defendant's Motion for Summary Judgment and the Plaintiff's Appendix A [DE 194], filed by Defendant Detective Sgt. Raymond Myszak on May 5, 2006; (3) Defendants Detective Michael Solan and Former Police Chief, Frank Dupey's Motion to Strike the Plaintiff's Response Brief to Defendants' Motions for Summary Judgment and the Plaintiff's Appendix A [DE 196], filed by Defendants Michael Solan and Frank Dupey on May 5, 2006; (4) Defendant's Second Motion to Strike as to the Plaintiff's Response to the Defendant's Motion for Summary Judgment and the Plaintiff's "Appendix A" [DE 211], filed by the City on May 8, 2006; (5) Defendant Detective Sergeant Raymond Myszak's Second Motion to Strike as to the Plaintiff's Response Brief to Defendant's Motion for Summary Judgment and the Plaintiff's Appendix A [DE 217], filed by

Myszak on May 12, 2006; (6) a Motion for Summary Judgment [DE 118], filed by the City on March 14, 2006; (7) Defendant Detective Sgt. Raymond Myszak's Motion for Summary Judgment [DE 121], filed by Myszak on March 14, 2006; (8) a Motion for Summary Judgment [DE 132], filed by Dupey on March 14, 2006; (9) a Motion for Summary Judgment [DE 134], filed by Solan on March 14, 2006; and (10) Plaintiff's Motion for Oral Argument of Defendants' Motions for Summary Judgment [DE 186], filed by the Plaintiff, Larry Mayes, on April 13, 2006.

## PROCEDURAL BACKGROUND

Larry Mayes filed a Complaint in this matter on September 3, 2003.

On December 19, 2003, Mayes filed an Amended Complaint, containing the following counts: Count I (42 U.S.C. § 1983 4th Amendment Claim); Count II (42 U.S.C. § 1983 14th Amendment–Denial of Fair Trial Claim); Count III (42 U.S.C. § 1983 Supervisory Liability Claim); Count IV (42 U.S.C. § 1983 *Monell* Claim Against the City of Hammond); Count V (False Arrest and Imprisonment Claim under Indiana law); Count VI (Intentional Infliction of Emotional Distress Claim under Indiana law); and Count VII (*Respondeat Superior* Against the City of Hammond). Mayes has sued Dupey and Solan in their individual and official capacities for supervisory liability, and has sued Solan and Myszak in their individual capacities for their acts performed in the scope of their employment and under color of state law.

Defendants the City, Myszak, John Ratajczak, Solan, Robert Townsell, Sgt Dennis Williams, and John and Jane Does filed an Answer to the Amended Complaint on January 13, 2004. On March 26, 2005, DuPey and Solan filed an Answer to the Amended Complaint, and on April 5, 2004, Robert Seaman and Richard Tumildalsky filed an Answer to the Amended Complaint.

On September 22, 2005, a Motion to Dismiss Defendant Dennis Williams was filed, and on September 29, 2005, the Court granted the motion, dismissing Williams without prejudice.

On March 13, 2006, a Motion for Summary Judgment as to the Death of Detective Sergeant Robert Townsell was filed. Mayes filed a response, but subsequently withdrew the response. On May 8, 2006, the Court granted the motion for summary judgment and entered judgment in favor of Townsell against Mayes.

On April 13, 2006, a Stipulation to Dismiss Robert Seaman and Richard Tumildalsky was filed, which the Court granted on April 25, 2006, dismissing Seaman and Tumildalsky without prejudice.

On April 26, 2006, a Stipulation to Dismiss John Ratajczak was filed, and on May 8, 2006, the Court granted the stipulation, dismissing Ratajczak without prejudice.

The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## MOTIONS TO STRIKE

On April 14, 2006, Mayes filed responses to the motions for summary judgment filed by the City, Myszak, Solan, and Dupey. Attached to the Memorandum in Support of each response is a fifty-five page, single-spaced "Appendix" entitled "Exhibit A: Plaintiff's Statement of Genuine Issues of Material Fact" ("Appendix A"). Various defendants have filed two sets of Motions to Strike this Appendix A. The Court will address each set of motions in turn.

## A. Motions to Strike [DE 190], [DE 194], and [DE 196]

In the first round of Defendants' Motions to Strike the Plaintiff's Response Brief to the Defendants' Motion for Summary Judgment and the Plaintiff's "Appendix A," ("Motion to Strike") Defendants City, Myszak, Solan, and Dupey argue that Mayes' 55-page Appendix A, entitled "Plaintiff's Statement of Genuine Issues of Material Fact," contains argumentative headings, lengthy interpretation, and in-depth analysis of the exhibits and in some instances is unsupported by evidentiary citation. Defendants generally contend that Appendix A is an inappropriate extension of Mayes' Response Brief and, thus, both the Appendix and the Response Brief should be stricken. Defendants provide a few examples of the alleged violations.

Local Rule 56.1 provides that, in opposing a motion for summary judgment, the non-moving party shall file a "Statement of Genuine Issues" "setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated." L.R. 56.1. The Rule permits the statement of genuine issues to be filed in the text of the response or as an appendix to the response. "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner: it is not intended as a forum for factual or legal argument." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000).

Local Rule 7.1 governs motion practice and the length and form of briefs. Rule 7.1(b) requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be accompanied by a separate supporting brief. The Rule goes on to require that, "[e]xcept by permission of the court, no brief shall exceed 25 pages in length (exclusive of any pages containing

a table of contents, table of authorities, and appendices), and no reply brief shall exceed 15 pages."
L.R. 7.1(d).  The Rules provide no page limit for the statement of genuine issues.[1]

A party who wishes to argue that portions of a statement of genuine issues contain errors or are inadmissible on evidentiary grounds may file a motion to strike those portions of the statement of genuine issues.  *Goltz v. University of Notre Dame du Lac*, 177 F.R.D. 638, 640 (N.D. Ind. 1997).[2]  "Pleadings that do not conform with the local rules may be stricken at the discretion of the court."  *Id.* at 640 (citing *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir. 1990); *Pfeil v. Rogers*, 757 F.2d 850, 858 (7th Cir. 1985), *cert. denied*, 475 U.S. 1107 (1986); *Graham v. Security Sav. & Loan*, 125 F.R.D. 687, 688-89 (N.D. Ind. 1989), *aff'd*, 914 F.2d 909 (7th Cir. 1990)).  More importantly, it is the function of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement.  *See, e.g.*, *SEC v. KPMG LLP*,

---

[1] In the City's motion to strike, the City analogizes the instant motion to strike with Mayes' earlier motion to strike Defendants' brief and appendix in support of their motion in limine concerning Steven Lynn, Ph.D.  The analogy is inappropriate as the filing and briefing of a motion in limine and a motion for summary judgment are not subject to the same requirements set forth in the Local Rules.  Whereas a Rule 56.1 motion for summary judgment or response thereto is permitted to present the statement of material facts or statement of genuine issues, respectively, in a *separate* appendix, which itself is subject to no page limitation, Rule 7.1 which applies to all other motions (e.g. motions in limine) does not permit a statement of facts to be contained in a separate document.  Accordingly, the Court's earlier holding in this matter striking the Defendants' appendix to their Motion in Limine is inapposite to the instant determination.  Nor does the Court's earlier ruling suggest, imply, or authorize a party to exceed the page limitations set forth in Local Rule 7.1 by including argument in a statement of material facts or statement of genuine issues contained within an appendix pursuant to Local Rule 56.1.

[2] The procedural error in *Goltz v. University of Notre Dame du Lac*, 177 F.R.D. 638 (N.D. Ind. 1997), is distinct from that currently before the Court.  In *Goltz*, plaintiff filed a statement of genuine issues along with the response in opposition to defendant's motion for summary judgment, and defendant then filed a response to the plaintiff's statement of genuine issues.  The court held that the Local Rules provided for a statement of material facts to be filed with the motion for summary judgment and a statement of genuine issues to be filed with the response, but that the Local Rules did not provide for a separate opportunity to respond to the plaintiff's statement of genuine issues beyond the page limit of reply briefs set forth in the Local Rules.  177 F.R.D. 638, 641-42.  In other words, the defendant filed an entire document not permitted by Local Rule.  Accordingly, the court struck the response to plaintiff's statement of genuine issues.

412 F. Supp. 2d 349, 392 (S.D.N.Y. 2006); *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, No. 04 C 5167, 05 C 2253, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, No. 03 C 2249, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004).

The remedy requested in the first series of Motions to Strike, which ask the Court to strike Mayes' Response and Appendix A in their entirety, is overly broad because much of the Statement of Genuine Issues is a proper recitation of the facts with appropriate citations and because the Court is capable of redacting from the Statement of Genuine Issues and of disregarding all argumentative headings, interpretation or analysis of the facts, or unfounded assertions of fact found in the Statement of Genuine Issues.[3] *See, e.g., BASF AG v. Great Am. Assur. Co.*, No. 04 C 6969, 2006 WL 1235943 (N.D. Ill. May 8, 2006). The Court's scrutiny of Mayes' Statement of Genuine Issues applies equally to the Court's review of the various Defendants' Statements of Material Facts offered in support of the Motions for Summary Judgment. To the extent that Mayes cross-references arguments and analysis made in response briefs to other motions for summary judgment, the Court will consider each instance in the course of reviewing the given issue.

---

[3] For example, ¶ 23 of the Plaintiff's Statement of Genuine Issues of Material Facts provides that "Ms. Jaynes stated at trial that the only descriptions she gave of the attacker were on the night of the incident and on November 18. . . ," citing Exhibit N at 120-124, Exhibit O, and Exhibit R at 243-49. However, pages 120 and 121 are not included in Exhibit N filed with the Plaintiff's Statement of Genuine Issues of Material Facts, and the remaining cited evidence does not include testimony from Ms. Jaynes regarding a description on the night of the incident.

In ¶ 29, the pages referenced in Exhibit CC discuss the importance of taking a detailed statement and of the detective writing down his notes as soon as possible but do not discuss the importance of taking a victim statement as early as possible in a rape investigation. In addition, page 48 of Exhibit CC is not attached. Also, although page 111 of Exhibit H discusses the timing of interviews and the importance of getting a description before showing a victim pictures, it does not directly support the proposition in ¶ 29 of the importance of taking a statement from the victim as early as possible. In contrast, Exhibit BB does support the cited proposition.

In ¶ 101, page 263 of Exhibit G does not address whether Townsell spoke to Ms. Jaynes and asked her if she would agree to hypnosis.

Accordingly, the Court denies the first series of Motions to Strike [DE 190], [DE 194], and [DE 196].

## B. Second Motions to Strike [DE 211] and [DE 217]

As to the second series of Motions to Strike, Defendants City and Myszak specifically request that the Court strike all of the headings of Appendix A and ¶¶ 4 (including n.2) - 6, 10 (including n.4), 12, 13, 17, 18, 24 - 93 (¶ 40 including n. 5), 111, 119 - 121, 123 - 125, 127, 129 - 146 (including ¶ 141, n. 9), 151-155, 172 - 175, 178 - 180, 200 - 210, 212, 214, and 216 - 249 (including ¶ 244, n. 12). The Court considers each objection in turn.

First, Defendants assert that the headings for each section are argumentative. Overall, the Court finds that the headings organize the facts according to each of Mayes' arguments or assertion of a genuine issue of material fact in opposition to the Defendants' statements of facts. The headings are not taken by the Court as the asserted facts themselves, and the Court denies the motions to strike as to the headings.

Defendants next argue that Appendix A is rife with argument, often without evidentiary citation, pointing to ¶¶ 4, 6, 12, 13, 18, 24, 25, 33, 37, 38, 40, 46, 47, 68 - 93, 129 - 143 (including 141 (footnote 9)), 146, 172 - 174, 178 - 180, 200 - 210, 212, 214, and 244 (footnote 12). Having reviewed these paragraphs, the Court grants the second motions to strike as to the following paragraphs for containing argument or for containing facts not supported by the referenced cite or not supported by any citation whatsoever: the reference in ¶ 4 to "a line up identification on February 13, 1981;" the last sentence of ¶ 4; footnote 9; the last two sentence of ¶ 47 (the cited evidence does not indicate that she started with the black and white photos or that she picked out

a black and white photo); all but the first sentence of ¶ 72 (Exh. L is an incorrect cite); the last five words of ¶ 80; the language in the first sentence of ¶ 81 after the number "17"; the last sentence of ¶ 87 (page 316 of Exhibit H is not attached); the first sentence of ¶ 93 starting with "and the prosecutor. . . ." (Exh. OO does not reference the sentencing); the first sentence of ¶ 134; the first sentence of ¶ 135 (this information is not contained in Exh. N at 104); the second sentence of ¶ 142 (page 128 of Exh. N is not attached); the last sentence of ¶ 178 starting with "presumably as evidence . . . ."; the first sentence of ¶ 179 (this information is not contained in Exh. UU at 66-67); any references to O'Drobinak in ¶ 200 (Exh. D at 18 is an incorrect cite); first sentence of ¶ 202; ¶ 206 starting with "he did not take issue . . . ."; quotation in ¶ 208 (the quotation apparently continues on to page 245, and page 245 is not attached); second sentence of footnote 12.  Paragraph 6 and the second sentence of footnote 9 have already been stricken by the Court in the Order denying in part and granting in part the Motion to Strike Plaintiff's DNA References and Evidence.

In instances in which the citation to the evidence of record is incorrect, but the Court comes across the proper citation in the course of reviewing the remaining facts, the Court will consider the facts to be supported by the correct citation.  However, the Court does not have an obligation to search the record for evidence that is potentially relevant to the summary judgment motion.  *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) (citing *Greer v. Board of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)).

The Court denies the second motion to strike as to the remaining paragraphs or portions of paragraphs on the basis that they are not argumentative or unsupported by citations in the record.  To the extent some of the facts of record are different than as presented by Mayes in his Statement

of Genuine Issues, even viewed in the light most favorable to Mayes, the Court considers the facts as supported by the record.

Third, Defendants assert that ¶¶ 6, 33, 69-71, 80, 119-121, 123-125, and 143 (including n. 11) include inadmissible opinions pursuant to Federal Rules of Evidence 701, 702, and 704 on three bases. Paragraph 6 has already been stricken by the Court in the Order on the Motion to Strike Plaintiff's DNA References and Evidence, and ¶ 121 has already been stricken in the Order on the Motion in Limine as to Steven J. Lynn.

Defendants argue that ¶¶ 33, 69-71, and 119-121 offer inadmissible speculative opinions. The Court denies the motion as to Rothlein's expert opinions in ¶¶ 33 and 71 because Rothlein is making his opinion based on a failure to comply with minimally accepted police practices and not upon an application of the facts to the law. The Court denies the motion as to Solan's statements in ¶¶ 69-71 because Solan's testimony regarding the "tentative identification" goes to Solan's state of mind regarding Townsell's statement to him and to Solan's own knowledge of those statements; these statements are not speculative and are within his powers of "perception." The Court denies the motion as to ¶¶ 119-120 because Dr. Lynn is qualified to testify as to the rules governing the use of hypnosis in criminal investigations and whether such rules were followed in this case based on the evidence of record; he is not giving a legal opinion.

Defendants argue that ¶¶ 80, 123-125, and 143 contain impermissible legal conclusions. The Court denies the motion as to ¶ 80, noting that the last five words have already been stricken; ¶ 123; the first sentence and citation of ¶ 124; ¶ 125; and ¶ 143 because these statements by Thomas Vanes, the deputy prosecutor in Mayes' criminal trial, are based on his knowledge of the facts and the decisions made in the case when prosecuting the case. The Court grants the motion as to the second

half of ¶ 124 because the testimony constitutes expert opinion, and Mayes has not disclosed Vanes as an expert pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), even if no report is required under Rule 26(a)(2)(B).

Fourth, Defendants ask the Court to strike ¶¶ 151-155 because they are from treatises and are hearsay pursuant to Rule 802. Mayes argues that they are admissible under Federal Rule of Evidence 803(18) as a hearsay exception. However, Rule 803(18) provides that statements contained in learned treatises may be admitted as exceptions to hearsay when the treatise has been "established as a reliable authority by the testimony or admission of [a] witness or by other expert testimony or by judicial notice." Fed. R. Evid. 803(18). In addition, Rule 803(18) applies only to the extent that the treatise is either relied upon by an expert witness during direct examination or is used to impeach the expert during cross examination. *See id*. Mayes has not identified any expert testimony showing that the treatise was relied upon for the expert testimony. Moreover, if admissible, Rule 803(18) permits the statements from the treatise to be read into evidence but the treatise may not be received as an exhibit. *See id*; *see also Finchum v. Ford Motor Co.*, 57 F.3d 526, 531-32 (7th Cir. 1995). Accordingly, the Court grants the motion to strike as to ¶¶ 151-155.

Fifth, Defendants argue that ¶¶ 34, 35, 37, 38, 40, and 175 contain mischaracterizations. The Court denies the motion as to ¶¶ 34, 35, 37, and 38, finding that the record citations support the facts asserted and reasonable inferences drawn therefrom. While contradictory inferences may be drawn from these facts, such arguments are not a basis for striking properly supported facts. The Court grants the motion as to the phrases "not in the morning as Townsell testified" and "that morning" in ¶ 40 because Townsell testified that Ms. Jaynes made identifications at the Hammond Police Department at approximately 1:00 p.m. and 5:30 but denies the motion as to the remainder

of ¶ 40.  The Court further grants the motion as to the phrases "was conducting hypnosis on witnesses in other cases and" in ¶ 175 as based on hearsay and speculation, not on firsthand knowledge, but denies the motion as to the remainder of ¶ 175.

Finally, Defendants argue that a significant number of passages in the Statement of Facts consist of fact that are irrelevant and immaterial on the basis that all of this information was available to Mayes to be litigated prior to or during his July 1982 criminal trial and conviction:  ¶¶ 4 (n.2), 5, 10 (n. 4), 12, 13, 17, 18, 25-93 (n. 5), 125, 127, 141-145, 214, 216-249.  Defendants provide no specific, individual analysis for any of these paragraphs.  The Court denies the motion as to these paragraphs as it is too early in the proceedings to determine what evidence among these 118 paragraphs may be relevant or immaterial to the various claims and issues in this case.

Based on the foregoing, the Court grants in part and denies in part the Second Motions to Strike [DE 211] and [DE 217] as set forth herein.

## MOTIONS FOR SUMMARY JUDGMENT

Pending before the Court are separate Motions for Summary Judgment filed by Myszak, Solan, the City, and Dupey.  The Court will consider each in turn.

### A.  Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56(c) further

requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate-in fact, is mandated-where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe. Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1526 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionary Union & Indus., Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of the witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 447 U.S. at 249-50; *Doe*, 42 F.3d at 443.


### B. Factual Background

In 1982, Larry Mayes was convicted of the October 5, 1980 rape, kidnaping, and robbery of Lisa Jaynes. In 2001, Ms. Jaynes was contacted by the prosecutor's office, at which time she disclosed to them for the first time that she had been hypnotized by a Hammond Police Department

("HPD") employee in the course of the criminal investigation. The employee was Detective Raymond Myszak. In 2001, Mayes' conviction was vacated, and he subsequently filed this suit.

*1. The Original Crime*

On October 5, 1980, Ms. Jaynes, then an eighteen-year old female, was working as a cashier at the Martin Oil Company gas station at the 7300 block of Kennedy Avenue, Hammond, Indiana, in Lake County. At approximately 8:30 p.m., two men entered the store. The taller of the two men approached the counter, asked for two packs of Winston Light cigarettes, displayed a gun, placed a blue denim bag on the counter, and demanded money from the cash drawer. Ms. Jaynes removed the money from the cash drawer, placed it in the bag, and gave it to the taller of the two men. Meanwhile, the shorter of the two men took cigarettes, bags of candy, and auto accessories from the two displays located in the gas station. The smaller man was wearing a hooded blue parka, kept his back or side to Ms. Jaynes, and kept pulling his hood up. Ms. Jaynes did not have a good opportunity to see the smaller man inside the store.

The two men then forced Ms. Jaynes to accompany them to an automobile. Specifically, the taller man told Ms. Jaynes to come with them. Before leaving, Ms. Jaynes grabbed her purse. As they were walking to the car, a four door, the taller man had Ms. Jaynes by the arm and the smaller man was walking in front. They all got into the car. The taller of the two men got into the back seat with Ms. Jaynes and the shorter of the two men got into the driver's seat and drove the car away from the gas station.

The car pulled out onto Kennedy Avenue heading south toward Interstate 94. The car entered the expressway and proceeded east toward Gary. The taller man told Ms. Jaynes to take off

her pants, then hit her on the head with the gun when she questioned him. The taller man again hit her on the head with his gun, and Ms. Jaynes started taking off her pants. The taller man then forced Ms. Jaynes to perform oral sex and forced her to have sexual intercourse.

The car then stopped, and the two men switched seats. The shorter man forced Ms. Jaynes to perform oral sex and to submit to sexual intercourse while the car was moving and the doors were closed. While the smaller man was raping her, his face was only three to four inches from her face, and she could see him clearly during this time. However, the car was dark, as the car's interior lights were only illuminated when the doors were open. Also, her head was bleeding profusely from having her head split open by the butt of the gun. While the smaller man was on top of her, Ms. Jaynes noticed that he had a gold-rimmed tooth at the upper right side of his mouth. Ms. Jaynes testified at trial that the smaller man ejaculated after he forced her to submit to intercourse, but she now says that she may have been mistaken that the smaller man did in fact ejaculate.

They drove around a while longer and finally stopped in a dark area in the Black Oak section of Gary at which time the men told Ms. Jaynes she could leave. Before leaving, Ms. Jaynes put on her clothes except for her socks which, along with her purse, she left in the back of the car. After she exited the car, Ms. Jaynes walked behind it to see the license plate number, and repeated the number over and over to herself in an attempt to memorize it. Ms. Jaynes then made her way to a house near 24th and Hovey in an area north of Burr Street and Black Oak, where she called the police and reported the license plate number. Ms. Jaynes then called the Martin station, finding that the police were already there, and the police sent a car to pick her up.

*2. Preliminary Investigation*

HPD Detective Townsell spoke with Ms. Jaynes for the first time while she was at 24th and Hovey.  Upon returning to the Martin station, Ms. Jaynes, while in the back of a squad car, answered questions for Hammond Patrol Officer Steve Ridgely, who was taking the offense report.  Ridgely prepared two offense reports, one for armed robbery and the other for kidnaping and rape, and recorded the information directly onto the offense reports.  However, detectives held off from questioning her further because she was "incoherent and upset" and "very upset and unable to relay information," so Townsell told them "to hold off on information."  The police reports note the license plate number of the car as relayed by Ms. Jaynes, but one letter is incorrect as the police later learned.

The initial police report taken on the night of the incident by Ridgley describes the larger offender as a 25-year-old black male, 6'-2" and 200 lbs, while the smaller offender is described as 5'-7", slim, 150 lbs with a "possible gold tooth."  At trial, Ms. Jaynes testified that she noticed a gold tooth while the smaller rapist was on top of her and that she recalled the location and that it was gold rimmed; she acknowledged that initially she told the officers that it could have been a gold tooth around the rim yet the police report says "possible gold tooth."  Ms. Jaynes' parents drove her to the hospital, where a rape kit was performed and specimens were taken.  Later testing of the specimens showed the presence of semen both in Ms. Jaynes vagina and on her clothing.  Larry Mayes had a gold tooth at the time that Lisa Jaynes was raped and robbed, in the upper right front.

Detective Townsell and Detective Ratajczak were assigned as the lead detectives for the investigation into the rape and robbery of Ms. Jaynes on October 5, 1980, and they remained the lead detectives in the case through Mayes' arrest and up to trial.

*3. The October 6, 1980 Identification*

Since the sequence of events regarding the investigation following Ms. Jaynes' release from the hospital are somewhat in dispute, the Court will consider the facts in the light most favorable to Ms. Jaynes.

The following day, October 6, 1980, Ms. Jaynes, her father Phil Jaynes, and Townsell met at the Gary Police Station. At the Gary Police Station, a Gary Police Officer assisted Ms. Jaynes in looking through approximately five books of photographs, containing hundreds of photographs with each page containing approximately twelve photographs. Ms. Jaynes did not make any positive identification on that occasion.[4]

Later that day, around 1:00 p.m., Ms. Jaynes and Townsell went to the Hammond Police Department to view more photographs. Townsell showed Ms. Jaynes an array or two of photographs each containing between eight and ten photographs. According to Townsell, from this group of photos, Ms. Jaynes identified the picture of Mayes as the smaller of the two men. Ms. Jaynes testified at Mayes' trial that she picked two pictures of Mayes from two arrays of eight to ten photos each. According to Ms. Jaynes' trial testimony, however, she did not identify the two pictures of the smaller rapist until later that evening. Townsell testified that later that same day, around 5:30 p.m., Ms. Jaynes identified a different photo of Mayes.

In the course of the criminal court proceedings against Mayes in 1981-82, both Townsell and Ms. Jaynes testified that Ms. Jaynes made a positive photographic identification of Mayes on October 6, 1980.

---

[4] Jaynes testified at Mayes' criminal trial that Townsell had been present at the Gary Police Department earlier in the day, watching her while she was looking through hundreds of photographs, and that during this photo viewing she did not make an identification but made several comments about photographs resembling in some respects the rapists. There is no police report documenting this identification procedure.

In his criminal proceedings deposition taken on January 25, 1982, Townsell testified concerning the first photo array on October 6, 1980, and conceded that he chose the pictures randomly and other than race and age made no effort to ensure they were similar. He further testified that Ms. Jaynes was shown 20 to 24 pictures during this array. At Mayes' July 1982 criminal trial, Townsell also testified that in the "morning," on October, 6, 1980, Ms. Jaynes was shown a photo array that included ten to twelve pictures and that she identified a single picture of Mayes. Townsell then identified the picture of Mayes and it was produced to the jury. At the criminal trial of James Hill, Mayes' purported confederate in the October 5, 1980 robbery and rape, in February 1982, Townsell testified that during this first photo array, Ms. Jaynes was actually shown and "selected two (2) photographs" of Mayes, "[o]ne a side view, and one of a straight face of the same individual." Pl. Br., Exh. FF, p. 520. Although this second picture was never testified to or produced at the Hill trial, the attached side view of Mayes was part of the police file produced to Mayes in discovery. The only two pictures contained in the police files from this case that fit the description provided by Townsell during the Hill trial, "one a side view and one of a straight face," are the single side view picture of Mayes in the top right corner of Exhibit GG, and the straight view picture which was actually produced at Mayes' trial. *See* Pl. Br., Exhs. EE, GG.

At the trial of Hill, Ms. Jaynes testified that she identified Mayes, the smaller of the two assailants on October 6, 1980, and that her identification of Mayes was positive. She also testified that she saw Mayes' gold tooth while he was raping her. Ms. Jaynes testified that she identified Mayes twice on October 6, 1980, from two different photo arrays. Townsell also testified at Hill's trial that Ms. Jaynes identified Mayes on the afternoon of October 6, 1980, on two occasions from photo arrays.

There is no indication that there were multiple photographs of any other persons in the group of as few as eight photographs shown to Ms. Jaynes as part of this initial photo array. Townsell described during the criminal proceedings deposition how he chose the pictures for the first photo array, stating, "I reached in my desk and I picked out a packet of pictures," and responding that there was no reason as to why he chose those pictures. Pl. Br., Exh. Y, p. 5. Mayes infers that Townsell's description that he reached into his desk and pulled out a packet of pictures at random suggests that Mayes was the sole person with multiple pictures in the same array.

According to Ms. Jaynes, she could not have identified Mayes until viewing the second group of photos that included Mayes in the evening, at 5:30 p.m., and only after viewing two photos of Mayes. Based on Townsell's testimony at the Hill trial, the defendants did not disclose to Mayes that Ms. Jaynes made no positive identification of Mayes the first time she viewed his picture in the earlier photo array.

According to Defendants' police practices expert, Michael Fleming,[5] there is no legitimate reason to show two pictures of the same person in one photo array; showing two pictures of the same person in different photo arrays might cause the victim to make an identification based upon seeing the picture twice rather than remembering the actual perpetrator; separate photos of the same person in one photo array would be suggestive; and there is no legitimate reason to, and that he would never show two photo arrays with a picture of the same person. More generally, Fleming understood in 1980 that it was essential to eliminate suggestiveness to the extent practicable, in any identification procedure including a photo array. Fleming agreed that he had never seen two pictures of the same

---

[5] Pending before the Court is the Plaintiff's Motion to Bar Defendants' Police Practices Expert Michael Fleming [DE 120]. Having considered that motion, the Court intends to deny the motion in a separate order to follow.

suspect purposely shown to a victim in consecutive photo arrays in any of the approximately 900 murders and rapes he investigated.

According to Defendants' other expert, Dr. Ralph Edward Geiselman, it is important that only one photo of an individual suspect be utilized, whether in a mugbook or photo array, because to do otherwise would signal to the witness that there is something special about the person being shown more than once and it would be suggestive. Geiselman further stated that if a victim is first shown a photo array with pictures of a single suspect and is subsequently shown another photo array with a picture of the same suspect, there are "carryover effects" and "[t]hey're, uh, very, very likely to continue to pick the person they've already picked." Pl. Br., Exh. AA, p. 68. He agreed that showing Ms. Jaynes three pictures of Mayes on October 6 could have had a carryover effect throughout the investigation.

According to Mayes' police practices expert, Steven Rothlein, showing two pictures of the same individual in a photo array could be extremely suggestive and lead to the witness identifying the photo as opposed to the assailant. He testified that in all his years supervising and conducting photo arrays in Miami and working with police officers and police departments around the country, he had never seen a photo array employed with two pictures of the same individual. Based on the evidence in this case, Rothlein opined that there may have been no positive or absolute identification made on October 6 sufficient to establish probable cause and that the identification procedures utilized on that day could have been unduly suggestive.

Lieutenant Solan, Townsell and Ratajczak's direct supervisor, testified that the only legitimate reason he knew for showing a victim multiple pictures of the same person is "if that officer just deep down just felt like the identification was wrong, and he just–just didn't feel right

with it," and that this would be consistent with HPD policy. Pl. Br., Exh. H at 348-49. Townsell admitted that once Ms. Jaynes identified Mayes "there was no reason to show her another picture of him." Pl. Br., Exh. Y, p. 7. Solan understood that showing a witness photos of the same person in consecutive photo arrays might cause the witness to identify the person based upon having seen the picture rather then remembering the person as the assailant. However, Solan testified that it was appropriate to show pictures to a victim before taking a detailed Q&A from the victim; that it was appropriate to show multiple pictures to a witness of the same suspect if the officer believed the witness was wrong; as a 30(b)(6) witness, that the reason why an HPD officer might wait as long as 5 weeks to take a Q and A of a victim is "[misidentification, where you feel the girl is wrong," Pl. Br., Exh. H, p. 322; Pl. Br., Exh. G, p. 187-88; and that a statement or Q&A is only required if there is an absolute identification.

In response to Solan's testimony concerning showing multiple pictures of the same suspect, Fleming reiterated the "last thing he would do" is show a second picture of the same suspect to a victim who has made any type of identification, particularly if he had doubts about the first identification. Pl. Br., Exh. W, p. 214-18. Fleming acknowledged that Solan's understanding of permissible photo array procedures might explain why two photo arrays were shown on the same day in this case.

The photo arrays that Ms. Jaynes viewed and from which she allegedly identified Mayes on October 6 were not preserved and maintained in the police file, and, although Ms. Jaynes viewed three pictures of Mayes, only one picture of Mayes was produced at his trial. The fact that two of the as few as eight pictures in the first photo array were pictures of Mayes was never documented or disclosed during Mayes' trial. The City, but not the individual defendants, admit that the October

6 identifications were never documented. Richard Wolter, Mayes criminal defense attorney, did not recall being provided with any witness statement prepared by Townsell that documented the October 6, 1980, identification. He believed that Ms. Jaynes' formal statement was taken later.

Both experts and numerous HPD detectives agreed that it was essential to maintain and preserve the photo array, so that the array could be scrutinized by the prosecutor and potentially the defense attorney to ensure it was not unduly suggestive. Preservation is important, particularly where there is an alleged positive identification and particularly where there are irregularities in the process. Mayes' and Defendants' experts agree that documentation of identification procedures and the statements made during identification procedures is essential and must be carefully recorded.

At the time of his criminal proceedings deposition, Townsell testified that he could not remember what description Ms. Jaynes gave of her attackers other than that it was general. Fleming, Defendants' police practices expert, agreed that if Townsell actually had taken notes or created documents from October 6, he would have expected Townsell to review them prior to giving sworn testimony in a criminal proceedings deposition.

Fleming could not recall a single instance in his twenty-seven years as a Chicago Police Department detective where a positive identification was made and there was no documentation of the process. Fleming further acknowledged that, if the victim expressed uncertainty or indecisiveness in an identification procedure, the detective was required to document and disclose that evidence to the prosecutor, and that failure to document an identification procedure or procedures could be evidence that there was some other problem with the identification procedure utilized.

Solan understood that it was essential to meticulously document the course of all photo array presentations, including everything the victim says about the identification itself and that normally there should be a Q&A immediately following the identification or within a day thereafter, all of which would be put into a supplemental report. More generally, he understood that careful documentation is one of the most basic and key aspects of any criminal investigation; and that it is essential to meticulously document both inculpatory and exculpatory evidence, without exception. Solan admitted that documentation is one of the best ways to ensure exculpatory evidence is disclosed. Solan further testified that he reviewed the file in preparation for his deposition and did not believe that anything was missing from the file as it existed in 1981 and 1982. Solan admitted that documentation is a key method to ensure compliance with *Brady*, particularly on critical investigative activities, and that investigators should take a broad view of disclosing exculpatory evidence.

Geiselman agreed that it is important that the person conducting the identification procedure document the procedure including the witness's own words concerning the identification because it is important to see if confidence is increasing over time. Geiselman agreed that there are circumstances in which it can be very difficult for the witness to differentiate between what is the actual recollection of the event and what is some after-acquired information that has changed the apparent recollection of the event.

Townsell also did not take the statement of Ms. Jaynes on either October 5 or October 6, 1980. According to Rothlein, Mayes' police practices expert, it was commonly understood since the 1970s that:

> A rape investigation almost always begins with interviewing the victim to determine the essential information of what happened, where it happened, when it happened,

how it happened, and who the assailant was. This interview is carefully documented in official reports and sometimes tape recorded. It is extremely important to document any statements made by the victim or witnesses to maintain the integrity of the investigation and also determine any inconsistencies which might be revealed.

Pl. Br., Exh. V, p. 6. Geiselman, Defendants' expert, emphasized that, "what goes on early in an investigation is very, very critical because it affects everything that happens later on" and that memory fades with time. Pl. Br., Exh. AA, p. 20-21. In this regard, he stated, "[I]t's always been my contention that the nature of the interview, the initial interview and even the follow-up interview, is critical toward preserving an accurate record of what their memory really is." *Id*. at 23-24. Detective Mak, one of the officers who did a photo array for Ms. Jaynes on November 17 also understood before 1980 that it was essential to obtain a detailed statement from the victim as early as possible in a rape investigation.

Vanes testified that anytime there was a positive identification, he expected to see a report that was prepared contemporaneously with the identification.

### 4. "Tentative" Identification

Townsell testified at Mayes' trial and during his criminal proceedings deposition that Ms. Jaynes positively identified Mayes twice on October 6, 1980. However, for the first time during his deposition in this civil case, Solan testified that on October 6, or within days thereafter, Townsell told Solan that he "had a tentative identification." Pl. Br., Exh. G, p. 126-27. In his deposition, Solan subsequently suggested that Townsell wanted to confirm that Mayes had a gold tooth and that is what he meant by tentative. Yet, Solan also testified that understood "tentative" to mean that "he had no absolute identification." *Id*. Solan never asked Townsell what he meant by tentative identification. Solan did not ask any follow-up questions, stating, "tentative identifications happen

24

all the time. This is nothing that is shocking that'd come to a supervisor and say. . . ." *Id.* at 127. When asked to describe what he meant when he said "tentative identifications happen all the time," Solan replied, "People say, 'I think this is him, I'm not sure,'" *Id.*, or "This is him. I'm not positive," "I'd like to see him in person." *Id.* at 204. Solan acknowledged that, pursuant to his definition, a tentative identification is no identification at all and is clearly *Brady* material. A tentative identification as Solan understood it may provide a lead but "absolutely" could not provide the basis for an arrest. *Id.* at 100-01.

According to Rothlein, "If there is any uncertainty about an identification, then it is not a positive identification." Pl. Br., Exh. V, p. 11.

During his criminal proceedings deposition in 1982, prior to Mayes' trial, Solan did not disclose that Townsell had described the October 6, 1980 identification as "tentative." During this deposition, Solan was asked the following questions and gave the following answers:

> Q. When was she first shown a picture or display with Larry Mayes' picture in it?
> A. You'll have to talk to Detective Townsell.
> Q. Okay. To your knowledge, do you know whether or not Lisa Jaynes picked out Larry Mayes' picture on each occasion she was shown that photographic arrangement?
> A. You'll have to talk to Sergeant Townsell.

Pl. Br., Exh. JJ, p. 217. In his civil deposition in this case, Solan admitted that, when he gave that testimony, he knew that Townsell had described a tentative identification soon after October 6. When asked why he did not provide information about the tentative identification in response to those questions he stated, "I don't know." Deputy prosecutor Vanes testified that Solan was meticulous and one of the reasons he had him sit at trial was that Solan would be very aware of the details of the testimony that was being presented.

Solan agreed that he was intimately familiar with the Jaynes investigation, particularly after he determined that evidence emerged that the case might be connected to another case involving the murder of Larry Pucalik, an off-duty Hammond police officer. Solan testified that he was asked to be lead detective at the Jaynes trial because of the possible link to the Pucalik murder.

Fleming, Defendants' police expert, testified that, based upon Solan's sworn testimony during his deposition, it appeared that Solan understood, in substance, that there was no absolute or positive identification on October 6, and thus Solan had an obligation to ensure that the tentative nature of the identification was documented and produced to the prosecutor. Fleming agreed that Solan had the same responsibility as Townsell to document the tentative identification or to ensure it was documented and make sure that the information was provided to the prosecutor.

Regarding Solan, Rothlein opined,

As [Townsell's] immediate supervisor, he should have asked him what he meant by tentative ID, but he failed to do so. Absent an explanation of what Townsell meant by tentative, which Solan did not seek or receive, Solan himself had a duty to disclose this information to the prosecutor as exculpatory information, based upon his own understanding of when an identification is referred to as tentative.

Pl. Br., Exh. V., p. 21.

Vanes was never told the October 6 identifications were tentative or equivocal in any fashion. Vanes testified that if he had been so informed, at a minimum he would have investigated the circumstances of the identification, and if the October 6 identification was tentative, Vanes would have likely dismissed the case. Vanes acknowledged in his deposition that the fact that the victim allegedly stated that if the suspect opens his mouth you will see a gold tooth does not suggest that anything about the identification was not tentative. Wolter, Mayes' defense attorney at trial, also was never informed that the October 6 identifications were tentative.

*5. The "Hypnosis" Session*

When contacted by the prosecutor in 2001, Ms. Jaynes revealed for the first time that she had been hypnotized during the rape and robbery investigation. Although the hypnosis session was never documented and never disclosed by the Defendants, the session must have occurred between October 6 and October 19, because the hypnosis session was intended to, among other things, help Ms. Jaynes remember the license plate number of her assailants' car, and the car was identified by October 20, 1980. Although Phil Jaynes, the victim's father testified that he believed the hypnosis occurred between two to four weeks after the rape, he volunteered that his memory as to the timing of events was "pretty fuzzy." Pl. Br., Exh. XX, p. 19-20.

When asked at deposition in 2004 what had happened in relation to the hypnosis session, Ms. Jaynes stated that, prior to the session, she knew that she was going to undergo hypnosis since the detectives discussed it as a possibility to help her with identifying the license plate number of the car and with the description and identification of the suspects. Phil Jaynes testified that he, his wife, and Ms. Jaynes discussed as a family whether or not she should proceed with hypnosis and Ms. Jaynes decided that she would since "Lisa had, by this time, indicated that she wanted to cooperate with the police to find the perpetrators of the crime and see that they got appropriately punished. And, frankly, I felt very proud of her for this and wanted to support her in it every way I could." *Id*. at 19-21. Ms. Jaynes and her father went to the Hammond police station knowing that she was to be hypnotized.

When Myszak entered the police station that day for his afternoon shift, Townsell yelled down the hallway to him, "Here comes the Department hypnotist now." Ms. Jaynes and her father

were with Townsell.  According to detective Myszak at his civil deposition, Townsell then asked him to hypnotize Ms. Jaynes but he refused, telling Townsell that any statements obtained through hypnosis might be inadmissible in court and that Solan had told him he could not use hypnosis for police work.  Eventually Myszak agreed to just relax Ms. Jaynes.  That was the first time that Myszak ever saw Ms. Jaynes.

Myszak, Townsell, Ms. Jaynes and Phil Jaynes then went into an interview room.  Ms. Jaynes described the session:

> We sat in an interview room . . . .  There were just a couple tables and a chair, an air conditioning unit was in there, and I sat in the chair and the hypnotist gave me instructions asking me to relax, close my eyes, kind of a guided imagery thing.
>
> . . .
>
> I was asked to relax, to close my eyes.
>
> I was kind of following his voice, listening to his voice, just concentrating on that, and then he told me to imagine walking into an elevator and the elevator would go down, and as the elevator went down I would become more and more relaxed, and when the doors of the elevator opened I would see a room with a–comfortable chair in it, and so I visualized the elevator door opening and walking into a room and I imagined a chair.
>
> I could describe the chair to you, but it wasn't anything anybody said, it was what my mind created as a comfortable chair, and I'm still looking for that chair by the way. So, I went and sat in the chair and they asked me to visualize like a movie screen, and depict on the movie screen the events that happened that night as if I was observing it watching a movie, and . . . then they took me back to, you know, the scene of the crime, and started with there, and kind of would fast forward to different parts of the event so I can focus on the license plate, and focus on the description of the individuals and focus on the face, and remember the face of the individuals involved in the event, and then once we had kind of gone through some of those details he asked me to keep that picture in my mind so that I could remember that picture, and it helps you separate out the emotion that was attached to the particular looking at the faces.
>
> So in one case I looked at the face of the person as they were standing in the gas station holding the gun, because that was the best light, and it was the best look I got

of his face, and the other individual I focussed[sic] on the face as he was on top of me, so that I could remember his face, and then they brought me out of that–he instructed me to go back up the elevator, and stuff like that . . . . I kind of woke up and [he] said you will be back in the room and we'll be with you, and everybody was still in the room that was there when they went.

I was aware of what was going on in the room as I was hypnotized, noticing different things, sort of how the little bleep think[sic] that went off, even though I was focusing on the questions that the interviewer was asking me. I could hear and notice - - I could hear the air conditioner running, a couple of times I assume it was Townsell flipping his Bic lighter, and I would hear it go, click, click, click. I would notice it, but I wouldn't focus on it. I was keeping my attention on the words that I was hearing, keeping my attention on the vision in my brain, the memories, and those kinds of things, so if anybody would rustle or move I was aware of it, I could hear it and notice it, but I was very aware.

Pl. Br., Exh. E, p. 22-25. Ms. Jaynes described how Myszak would direct her to various parts of the event while she was hypnotized:

He said to first take a look at - - I was referring to them as the bigger and the smaller, so, he would say take a look at the bigger guy, go to the place . . . in the experience when you saw his face the clearest, and then when I would say okay, I'm there, then he would say where are you, and I would describe I was in the gas station, that kind of stuff, and then he would say go to the place where you see the face of the smaller of the two, and I remember in that instant . . . . I could feel my face scrunching up[6] and he would say where are you now, and I would describe to him that I was in the process of being raped, and he said, you know, focus on the face, keep a picture of the face, try to separate it from the event, but just keep a picture of that face, and then fast forwarded me away from it as soon as possible so I didn't have to kind of stay focusing on that particular event, but keeping the picture in mind, keeping the face in mind.

Id. at 31-32.

Ms. Jaynes testified that she "gave a detailed description of the person after being hypnotized, so they told me to take the picture, keep it in my mind, brought me out of hypnosis and then I described what he looked like," Id. at 33, and further stated:

---

[6]Defendant Myszak did not recall Ms. Jaynes face scrunching up, and suggested that "she could have visualized that was happening to her . . . ." Pl. Br., Exh. NN at 130-31.

> I think after coming out of the hypnosis we sat down and reviewed what had happened, we talked about the description again, I think we looked at pictures again after that. It was either - - I think it might have been the next day that I looked at pictures again. They went away and took me home or whatever, and I think the next day they came back with pictures. It's my recollection that it was the very next day that I identified Mayes - that's what I remember, I don't know if that's accurate, but that's my best recollection. I remember being amazed that now I could find a picture of him when I couldn't before.

*Id*. at 37-38. Ms. Jaynes estimated that the hypnosis session lasted about an hour, although she said it could have been for hours.

At her deposition in this case, Ms. Jaynes testified that after the hypnosis session with Myszak and Townsell, she was interviewed by Townsell and either Myszak or Ratajczak. During this interview, Ms. Jaynes described the people who raped her to Townsell. Townsell did not document and did not disclose any documentation of this post-hypnotic interview.

Ms. Jaynes also testified in her deposition that when she was contacted by the Lake County prosecutor in 2001, she informed the prosecutor that she was unable to identify the shorter of the two rapists before she was hypnotized. The prosecutor's notes from that conversation read, "w/ some help hypnosis . . . before I ever ID'd any picture of Mayes I was hypnotized. . . looked at pics immediately after . . . does feel she was hypnotized and it helped." Pl. Br., Exh. MM. Ms. Jaynes also testified that she was unable to make a photographic identification of the smaller of the two men until after she had been hypnotized.

Ms. Jaynes testified in her 2004 deposition, and Myszak largely agreed, that she participated in the hypnosis session for reasons including that she wanted to remember the faces of both of her assailants. Myszak acknowledged during his civil deposition that during the session with Ms. Jaynes he had her visualize the faces of the persons who had raped her. Vanes agreed that if, in fact, the hypnosis procedure conducted by Myszak and Townsell involved attempts to have the witness focus

on the faces of the perpetrators of the rape, that would suggest that at the time of the hypnosis there had been no positive identification of the perpetrators.

Dr. Steven Lynn, Mayes' hypnosis expert, noted that "[h]ypnosis is not a reliable means of ascertaining the historical accuracy of a witnessed event," Pl. Br., Exh. WW, p. 8, because it increases the volume of incorrect information recalled, produces false memories, and increases a subject's confidence in her memory, even though that memory is inaccurate. Dr. Lynn testified that

> [e]xcessive confidence in what is remembered warrants special concern in legal settings insofar as the confidence expressed by a witness is the single most important factor in persuading subjects-jurors that a witness correctly identified the culprit" (Wells & Branford, 1998). As Steblay and Bothwell (1994) have argued, " . . . hypnosis may be a source of inaccurate information provided with confident testimony" (p. 649).

*Id*. at 9. Dr. Lynn explained the Hurd rules, which were specifically approved by the Indiana Supreme Court prior to the determination of Mayes' appeal and which required that if hypnosis were performed, six procedural rules be followed, including that 1) the hypnosis be conducted by a psychiatrist or psychologist experienced in the use of hypnosis; 2) the professional conducting the session should be independent of and not regularly employed by the prosecutor, investigator or defense; 3) any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form; 4) before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them; 5) all contacts between the hypnotist and the subject must be recorded; and 6) only the hypnotist and the subject should be present during any phase of the hypnotic session. Dr. Lynn noted that "nothing approximating the Hurd guidelines were followed" in this case. *Id*. at 13. Geiselman agreed that the typical outcome of hypnosis is that people become more certain in their identifications.

The Court notes that there is a disputed question of fact as to whether the hypnosis session was in fact a hypnosis, as asserted by Mayes and his expert, or simply a relaxation session, as argued by the Defendants and their experts. Because the Court views the facts in the light most favorable to Mayes for purposes of summary judgment, the Court will characterize the session as a hypnosis for this purpose. Accordingly, all other facts offered by the parties as to the nature of the session will not be set forth in this Order but may appropriately be argued at trial.

There is no dispute that neither the hypnosis performed by Myszak nor the interview with Townsell immediately afterwards was disclosed to the prosecutor in the criminal case and that both were kept from Mayes until Ms. Jaynes reported the session in 2001. Wolter, Mayes' defense attorney, did not learn of the hypnosis or the tentative identification until Ms. Jaynes' disclosure in 2001.

Vanes, the deputy prosecutor at Mayes' criminal trial, was unaware of the session and signed an affidavit in this case in which he stated that:

> Whether the actions of Detective Myszak at this session were merely an attempt to relax Ms. Jaynes (as stated by Myszak), or to hypnotize her (as stated by Jaynes), I should have been informed of those actions by the Hammond Police Department. In either case, I was required, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and subsequent case law, to report this information to counsel for the defense because it bore on the circumstances surrounding her identification and it constituted exculpatory and/or impeachment evidence to which the defense was entitled before trial. Whether or not hypnosis actually occurred, I would have had a duty to disclose this evidence.

Pl. Br., Exh. I, p. 167-68. Further, Mr. Vanes averred:

> At the time of the trial of Larry Mayes it was clear in Indiana that information about hypnosis of a witness had to be provided to defense counsel, and that if hypnosis had occurred the burden was on the State to establish by clear and convincing evidence that the identification of the defendant had a factual basis independent of the hypnotic session. *Merrifield v. State*, 272 Ind. 579 (1980); Strong v. State, 435 N.E.2d 969 (Ind. 1982).

Pl. Br., Exh. J, at ¶ 5.

Vanes acknowledged that the admissibility of any post-hypnotic identifications would also be adversely affected by the fact that the hypnosis procedure had not been videotaped, there had been no pre-hypnotic statement taken from the witness, and the hypnosis had not been conducted according to accepted forensic protocol.  Also, the fact that a witness had undergone hypnosis prior to testifying was something that the jury at the criminal trial was entitled to know.

Myszak had several conversations with Vanes before the criminal trial of Mayes, but never advised him of the hypnosis of Ms. Jaynes.

According to HPD Detectives Mak and McPhillips, the session described by Jaynes should have been recorded and provided to the prosecutor.  According to Rothlein:

> The process which was utilized by Sergeant Myszak was not consistent with minimally accepted police practices concerning identifications.  The utilization of an officer who is described in front of the victim as a hypnotist, and whom she believed hypnotized her is extremely unusual.  In fact, in conducting hundreds of investigations using photographic line-ups and supervising hundreds of others, I have never heard of a session described by the victim as follows.

Pl. Br., Exh. V, p. 10.  Further, Rothlein found:

> This was a highly irregular identification process which was not documented and contrary to acceptable police practices utilized in 1980.  A procedure such as the one described by the victim, which clearly in her mind affected her identification, has to be documented in official police reports.  Regardless of the state of the law on hypnosis, law enforcement practice has been clear prior to 1980 that any unusual circumstance surrounding an identification process must be recorded and documented for subsequent judicial review.  It is clear from the testimony in this case that the investigators understood their duty to disclose exculpatory information, yet intentionally chose not to document this session report.

Pl. Br., Exh. V, p. 10-11.

Further, and contrary to Defendant Myszak's contention that Rothlein testified that it was reasonable for Myszak to rely on Townsell to document the session, Rothlein stated that Myszak had

an obligation to ensure that the session was documented by someone, and, if he knew it was not reported, that he was equally responsible, particularly where, according to Myszak, Solan had forbidden hypnosis.

During his criminal proceedings deposition in 1982 and his sworn testimony, Myszak did not disclose the hypnosis session. He was asked the following series of questions and gave the following answers:

> Q: When did you become involved with the robbery of the Martin Service Station in Hammond?
> A: I conducted a lineup in reference to that–In reference to that robbery, I conducted a lineup.

Pl. Br., Exh. TT, p. 3.

> Q. Other than that lineup involving Larry Mayes, did you become involved in any other way with the investigation involving Lisa Jaynes?
> A. I need something more specific than that, Counselor.

*Id*. at 4-5.

> Q. Did you do any investigative work involving the case?
> A. It's too general of a statement. I can't answer that.

*Id*. at 5.

> Q. So you didn't work on this case at all?
> A. I conducted the lineup.

*Id*. at 5.

> Q. When was the first time you talked with Lisa Jaynes, if you recall?
> A. I can't recall.

*Id*. at 29.

During his deposition in this civil case he testified that he did not mention the hypnosis session in response to the many questions above in 1982 because he "didn't recall that session." Pl.

Br., Exh. NN, p. 227-28.  Myszak claimed at his deposition in this case that this was the only time in his entire police career that he had used the "relaxation techniques," which he had learned at the hypnosis training.  Similarly, he testified that he did not recognize Ms. Jaynes as the person he tried to "relax" when he conducted the lineup in the case a few months later:

> Q. You're telling us that this -- you had done the relaxation technique and then this person, you do the lineup, and you don't recognize it's the same person?
> A. No. No, sir.

Pl. Br., Exh. NN, p. 203.

In the course of Townsell's deposition in the criminal case, Townsell was also asked numerous questions that should have led to disclosure of the hypnosis session, yet on each occasion he did not disclose it.  On page 3 he is asked to give a "narrative of your involvement in the investigation."  On page 4 he is asked, "would you just tell me what you did as part of your investigation?"  On page 5 he is asked, "on what other occasions [besides October 5] did you talk to Lisa Jaynes?"  He did not disclose the hypnosis session in response to any of these questions.  On page 6 he is asked "when is the next time [after October 6] you talked to Lisa Jaynes about Larry Mayes?" and responds, "I spoke to her two different times, during the month of October."  Townsell was later asked, "Did you subsequently, at any time after the incident, talk with Lisa Jaynes?" to which he replied, "Yes, I talked to her after the incident . . . . The first time was the night of the incident, then the following day.  I may have talked to her on the phone a few times in between; I'm not sure. But on the night, I believe November 17 the, when she made an identification of James Hill."  Pl. Br., Exh. Y, p. 3-5, 18.

The Plaintiff's expert, Steve Rothlein, stated in his deposition that, other than the deposition testimony of Ridgely, he had reviewed nothing that showed Myszak or accuses Myszak of practicing

hypnosis in the HPD.  The Plaintiff's expert, Rothlein, acknowledged that the officers' testimony indicated that the HPD had an explicit policy against the use of hypnosis at the time of the events in question.

Solan testified that the use of hypnosis was forbidden as a matter of policy of the City during the time of the events in question, and its use is only alleged to have occurred once, in relation to the events at issue in the instant action.  Solan testified that he was involved with the HPD detectives on a close enough basis in 1980 that if hypnosis had been used by anyone on the detective squad, that he was confident he would have known about it.  Solan testified that if there was any evidence of the use of hypnosis beyond the alleged hypnosis currently at issue, that it would shock him.  Solan testified that he talked to Henry Garrison, who was doing the investigation for the City of Gary and told him that if Mr. Garrison found out that hypnosis was done by anyone, that Solan wanted to know, and that Mr. Garrison told him that there was nobody that knew of hypnosis on Ms. Jaynes or of any hypnotic session that Myszak conducted in any criminal investigation.  According to Solan, there was no need to document the hypnosis session that Myszak and Jaynes described and neither Myszak nor Townsell had an obligation to do so.  Solan further stated that the session was not exculpatory evidence if it was a relaxation session but only if it could be proven that Ms. Jaynes was actually hypnotized.  Solan further stated that the fact that Ms. Jaynes was told she was going to be hypnotized is not *Brady* material.

In his January 2006 deposition, current Hammond Police Chief Brian Miller testified that, in his fifteen years of experience at the HPD, he was aware of no incidents involving hypnosis. Chief Miller testified that to his knowledge, there has never been any hypnosis in the HPD.  At no time during his thirteen-year tenure did Vanes learn that the HPD had a policy or custom of

conducting hypnosis to gain information pertinent to a criminal investigation or that it was ever used other than on one occasion in which the police officers considered hypnotizing a man to get a license plate. Vanes recalls one occasion when he was asked his opinion about the use of hypnosis by a law enforcement officer, and he advised that officer against its use.

### 6. November 17, 1980 Identifications

On November 17, 1980, almost six weeks after the rape, Hammond Police Detectives Mak and McPhillips showed Ms. Jaynes another photo array that included a picture of Mayes. At the time, Mak and McPhillips were assigned to investigate the murder of an HPD police officer, Larry Pucalik. Mak and McPhillips gave Ms. Jaynes three stacks of pictures to view with black-and-white mugshots and color photos separated into different piles. Before Mak and McPhillips showed Ms. Jaynes photos on November 17, they reviewed the Jaynes investigative file, read reports, and saw no evidence of the prior identifications. Mak and McPhillips learned that Ms. Jaynes had previously viewed photographs of Mayes with Townsell during their interview of her on November 17. Following the November 17 identification, Mak and McPhillips took a detailed Q&A and also created a Supplemental Report summarizing their activities. The Supplemental Report, created almost six weeks after the alleged identification with Townsell, was the first and only documentation of the October 6 identification procedures conducted by Townsell.

Mak and McPhillips did not report to Solan; they were supervised by Lieutenant Seaman.

In explaining why there was no documented witness interview and no documentation of the alleged October 6 identifications, Solan suggested that pursuant to HPD policies, the November 18, Q&A by Mak and McPhillips might constitute sufficient documentation of these events, stating:

"If that officer [Townsell] communicated with those officers [Mak and McPhillips], and the content of the Q and A was the same as that interview, it would be [consistent]." Pl. Br., Exh. H, p. 237-38, 241. Solan further agreed that "the only way Detective Townsell could fulfill his responsibilities, documentation responsibilities, by relying on the Q and A conducted by Mak and McPhillips would be if he read that statement and determined that everything that he had -- he had found was contained in that statement." Pl. Br., Exh. G, p. 223. In this regard, Townsell admitted that he never even read the Q&A taken by Mak and McPhillips on November 18: "To be truthful with you, I never read her statement; it was taken by two other officers." Pl. Br., Exh. Y, p. 29. Solan acknowledged that he was troubled by this testimony and acknowledged that based upon his reviewing Mak and McPhillips' November 18 report, it was clear they made no effort to document any prior identifications for Townsell other than the fact of the prior identifications.

Solan has testified that he believed that the first positive identification of Mayes was on November 17. Solan further testified that the determination that there was probable cause to make an arrest occurred after Mak and McPhillips again showed Jaynes the picture of Mayes on November 17. According to Vanes, if Solan testified that the first identification was on November 17, it could be interpreted that the October 6 identification was tentative because the witness was uncertain about the identification. Solan testified that one reason why an HPD officer might wait as long as five weeks to take a Q&A of a victim is "[misidentification, where you feel the girl is wrong." Pl. Br., Exh. H, p. 322; Exh. G at 187-88.

In regard to Townsell's efforts to determine whether Mayes had a gold tooth, Solan testified that, as of November 17, when Mak and McPhillips sought a warrant for Mayes' arrest, Townsell had made no progress in determining whether Mayes had a gold tooth. According to Solan, the

detectives did not learn that Mayes had a gold tooth until he opened his mouth while he was being arrested in January 1981.[7]

## 7. Probable Cause

On January 9, 1981, Lisa Jaynes signed an affidavit for probable cause that stated that she had viewed a photographic display and positively identified a photograph of Larry Mayes as the shorter of her two assailants. According to Vanes, a positive identification from a photo array is sufficient basis for probable cause. The photographic identifications on October 6 and November 17, 1980, served as the sole basis for probable cause for arresting Mayes. Vanes testified that, if Vanes had received information that Ms. Jaynes' identifications were the product of undue influence or untoward suggestion, he would have asked for a pretrial hearing, and without the identifications, there would have been no case. In addition, he testified that Mayes' attempts to influence the jury in his first criminal trial would never have been heard by a jury absent a positive, admissible identification by the victim. Although Mayes had a prior criminal record,[8] there is no suggestion that Mayes' prior convictions were utilized as a basis for probable cause.

---

[7] Apparently, in October 1980, there was a report available to the HPD, created by the East Chicago Police Department, which contained identifying information about Mayes, including the fact that he had a gold tooth. In addition, Townsell met with Bertha Allen, Mayes' alleged partner, in December 1980 over a month before Mayes' arrest and weeks after Mak and McPhillips sought a warrant; however, there is no evidence that Townsell even asked her whether Mayes, someone she testified at trial she knew well, had a gold tooth. At Hill's trial, Bertha testified to the fact that Mayes had a gold tooth.

[8] Larry Mayes was convicted of carnal knowledge of a female and armed robbery in Wayne County, State of Michigan, on November 6, 1969, and was convicted of felony robbery in Common Pleas Court of Lucas County, State of Ohio, on December 27, 1973, after having been indicted for this crime on February 8, 1973. Mayes testified in this case that regarding the rape conviction from 1969 when he was 19 years old, a crime he denies, the woman was someone he knew and had been involved with sexually before the alleged incident that led to charges being filed.

*8. The Line-Up*

On February 3, 1981, Myszak conducted a lineup for Ms. Jaynes consisting of five people of which Mayes was No. 4. At this lineup, Ms. Jaynes initially picked out someone other than Mayes as her assailant. After she identified the wrong person, Myszak grabbed her and said, "Come on in the room; and shut the door and look at everyone and see if he is in here." Pl. Br., Exh. BBB, p. 305 (Myszak trial testimony). After Myszak grabbed her and brought her into the room, Ms. Jaynes looked again at the suspects for a minute or two without making an identification. Then Myszak offered to have the suspects speak, which Ms. Jaynes accepted. The suspects did in fact speak, and after two to three minutes, she identified Mayes as her assailant. Although Myszak testified that he could not remember if anybody spoke during the lineup, he did admit at his criminal proceedings deposition that Mayes was smiling and that a false tooth was visible during his lineup.

In his report concerning the lineup, Myszak quotes Ms. Jaynes in the comments section of the report stating, "'number 5. number 4 that's him, it looks like him, yes that's him,' Myszak are you positive? 'definitely yes.'" to describe the above events. Pl. Br., Exh. CCC. Solan had no concerns about the manner in which the lineup was conducted in this case at the time he read the lineup form.

The fact that Myszak hypnotized Ms. Jaynes weeks before the lineup was never disclosed at the criminal trial and thus was not considered by the jury or by the Indiana Supreme Court when it considered the appeal.

During the Hill lineup, Ms. Jaynes walked in the room and picked Hill instantaneously. "She just walked in and said, 'That's him.' Boom, it was just so fast." Pl. Br., Exh. BB at 73. Mak acknowledged that he knew that Hill was the suspect for that line up. Despite the fact Ms. Jaynes

made an instantaneous pick, Mak did not ask her to view all the suspects more carefully and make sure that her initial reaction was correct. In fact, Mak agreed that it would have been inappropriate for a police officer to tell a witness to reconsider their choice of who they had picked out of a lineup. According to Mak, as soon as there was a wrong selection, you should immediately type up a supplemental report saying she identified the wrong person.

Regarding lineups, Geiselman testified that the person administering the lineup should avoid saying anything to the witness that may influence the witness' selection because

> [b]asic research on these procedures show that any, um, hint or suggestion to the witness as to which one is the police suspect will cause a certain percentage of the witnesses to choose that one, especially under conditions where the witness' memory is not very good as a function of the circumstances of the event. They're looking for a cue and they'll pick up on that.

Pl. Br., Exh. AA, p. 71. According to Rothlein, because of the prior session with Myszak, the fact that Myszak "suggest[ed] that the first selection was wrong," made it even more likely that the victim would be improperly influenced to select another suspect. Pl. Br., Exh. V, p. 13.

*9. Bertha Allen*

In December of 1980, before Mayes was arrested, Townsell allegedly traveled to Michigan and interviewed Bertha Allen. During this interview, Townsell showed her pictures of both Mayes and Hill and she allegedly recognized Hill as someone to whom Mayes had introduced her. Allen subsequently testified concerning the connection between Hill and Mayes at Mayes' criminal trial. Despite the importance of Allen's alleged statement, no contemporaneous documentation was made of this meeting. Townsell did not document the interview stating, "At that time, we were busy on other investigations, and I just didn't." Pl. Br., Exh. Y at 17. There was no evidence that he

maintained the photo shown to her. In fact Townsell did not even take notes of this meeting. This interview was first documented in a report dated June 22, 1981, six months later, when Allen was allegedly interviewed a second time by Townsell. There is no evidence that anyone other than Allen connected Mayes and Hill, and Mayes denied and continues to deny ever knowing Hill.

*10. Mayes' Trials*

Mayes had two criminal trials. Mayes' trial counsel was Richard Wolter, and James Hill's trial counsel was Lonnie Randolph. The first trial of Mayes ended in a mistrial because Mayes attempted, through a Mark Watson, to enlist the aid of Miriam Gates, one of the sitting jurors.

The second trial of Mayes resulted in Mayes being convicted of rape, unlawful deviate conduct and robbery, followed by a finding that he was a habitual offender. The court sentenced Mayes to a total of 110 years in prison.

The primary evidence used to convict Mayes were the alleged positive photographic identifications made by the victim. The other substantial evidence introduced at trial was Allen's testimony that Hill and Mayes knew one another, which Mayes and Hill deny, serological evidence demonstrating simply that Mayes could not be excluded as the rapist based on serological testing, and evidence concerning Mayes' alleged attempt to influence a juror during the first trial. Both Ms. Jaynes and Townsell testified that Ms. Jaynes had positively identified Mayes on October 6. Mayes' prior convictions were not introduced at trial. Despite her insistence at trial that she was able to clearly view the smaller rapist during the rape, Ms. Jaynes could not recall if the smaller rapist had facial hair or not. It is apparent from the questioning at trial that Mayes had a mustache at the time of trial.

Mayes, by post-trial counsel Fran Hardy, filed a Petition for Post Conviction Relief. Mayes subsequently appealed his conviction to the Indiana Supreme Court in *Mayes v. State*. At issue in *Mayes v. State* was Mayes' contention that insufficient evidence existed to affirm his conviction, but the Indiana Supreme Court found sufficient evidence to affirm Mayes' conviction. In so doing, the Indiana Supreme Court examined and discussed the validity of the October 6 identification and the two subsequent identifications. In his 1984 criminal appeal, Mayes also challenged as erroneous the trial court's admission of the testimony of two witnesses who testified that Mayes had tried to influence the jury. In *Mayes v. State*, the Indiana Supreme Court found the evidence that Mayes had attempted to influence a juror properly admissible as to his consciousness of guilt. In his criminal appeal, Mayes did not raise *Brady* violations or suggestive identification as grounds for reversal.

In 2001, Hardy and Lake County Deputy Prosecutor Kathleen O'Halloran filed a Joint Petition for Release. On December 20, 2001, Judge Richard Maroc, the same judge who had presided over Mayes' 1982 criminal trial, granted these petitions, vacated Mayes' convictions, and ordered Mayes' release from the Indiana Department of Correction.

*11. Minimally Acceptable Police Practices in 1980*

Rothlein, the plaintiff's police practices expert, testified:

Law enforcement agencies establish policies which are designed to provide broad principles to guide personnel in the accomplishment of general organizational goals. Rules and regulations are created to provide specific guidelines of conduct and performance. They are parameters for acceptable conduct and designed to prevent deviations from acceptable performance and behavior in conducting law enforcement investigations and operations. Rules must reflect the views of the top of the organization and the mission of the agency.

Pl. Br., Exh. V, p. 18-19. According to Rothlein, "[a] rape investigation is perhaps one of the most critical responsibilities of a law enforcement agency because of the violent nature of the crime, and the potential of additional violence should the case remain unsolved." *Id*. at 6. According to Rothlein, since the 1970s, responsible police departments required, through a coordinated combination of written regulations, training, and close supervision, that their officers employ the following minimally acceptable police practice in conducting rape investigations: "Create a detailed witness statement," ensure "the systematic recording of all events, which occur from the moment the call is received," and "get a detailed description of the attacker before initiating identification procedures to ensure any subsequent identification matches the description provided by the victim, and to prevent suggestiveness." *Id*. at 7.

In regard to photo arrays, Rothlein emphasized that, through regulations, training and supervision, police departments must ensure the following: "the results of what occurred at the viewing should be documented in official reports," if a photo is selected the entire array should be preserved, *id*. at 7; and "[d]isplaying photos to a victim on multiple occasions is not consistent with acceptable police practices because it weakens the identification . . . [and] could lead to not identifying the assailant, but identifying the photo, which is continually being displayed." *Id*. at 13.

As Rothlein referenced in his report and testified to in his deposition, since as early as 1970, the International Association of Chiefs of Police ("IACP"), other police departments and police organizations and police experts have provided model policies, treatises, regulations and other standards, all of which have provided minimum standards which have become accepted in the industry.

*12. Police Practices in the HPD in 1980*

From 1976 to 1989, Vanes was employed as a deputy prosecutor in the Lake County Prosecutor's office. Sometime around 1980, Vanes became the supervising attorney for the Career Criminal Unit of the Lake County Prosecutor's Office. Mr. Vanes was the deputy prosecutor for the criminal prosecution of *State of Indiana v. Larry Mayes*. Mr. Vanes had frequent contact with officers of the HPD over the 13 years during which he served as a deputy prosecutor. The Lake County Prosecutor's office works closely with law enforcement agencies in every municipal jurisdiction in Lake County, and has contact with the Federal Bureau of Investigation ("FBI"). Among the various state and municipal law enforcement agencies, the HPD provided him and his colleagues in the Lake County Prosecutor's office with well documented files that were generally more extensive than any other department that filed cases with the possible exception of the FBI. The HPD files compared favorably in quality to those of the FBI. Vanes testified that the HPD probably had the most or second most cases pending in the prosecutor's office during Vanes' experience.

As a matter of routine, investigatory files from the police departments within Lake County, including the HPD, were turned over to the Lake County Prosecutor's Office, which then furnished a copy of the file to counsel for the criminal defendant. Vanes is aware from his direct examination of Ms. Jaynes that she identified Mayes from photos on October 6, 1980, one day after the rape. Vanes is aware that Ms. Jaynes asserted that one of her assailants had a distinctive physical characteristic, a gold tooth.

Plaintiff's expert, Mr. Rothlein, testified that, aside from Townsell's statement to Solan concerning a tentative identification on October 6, 1980 currently at issue, he found no other instances in the HPD where purportedly exculpatory evidence was not furnished to prosecutors.

In 1980, HPD supervisors understood that it was important to document identification procedures to ensure that exculpatory evidence be preserved and disclosed.

For the one hypnosis session that Solan was aware of, he said it was "documented in accordance with *Brady*," Pl. Exh. H, p. 149-50, and he agreed that it was important to eliminate suggestiveness in identification procedures to the extent practicable.

Chief Frank Dupey understood the importance of utilizing other policing organizations like the IACP to guide the HPD concerning appropriate police procedures. When Dupey became chief, he became a member of the IACP as was his predecessor. Dupey understood that it was his obligation as chief of police to ensure that the practices of the HPD were consistent with the practices of other similarly situated metropolitan police departments and one of the ways to ensure compliance was to follow the guidelines that were set out by the IACP.

Despite the availability long before 1980 of information from the IACP and other organizations, police departments, and texts and treatises referenced in Rothlein's report, the HPD had no protocols concerning the most basic investigative tasks at issue in this case: documenting and disclosing exculpatory and impeachment evidence and conducting identification procedures.

Solan, the City's chosen 30(b)(6) witness on policies, procedures, and training, did not remember any written rules and regulations concerning conducting identification procedures including photo arrays or avoiding suggestion in identification procedures and he believes this was an area where detectives had complete discretion. There are currently no written policies concerning

identification procedures.  According to Solan, there was no written policy in the HPD concerning documenting and disclosing exculpatory and impeachment evidence and there could be no such policy because every case is different.  There were no written policies or protocols for conducting serious criminal investigations such as rape investigations.  According to the City's other 30(b)(6) witness, there were no written rules and regulations that in any way dealt with requirements for documenting criminal investigations.

There was no system to ensure that detectives' notes were subsequently recorded in a police report.  There were no written rules or regulations concerning the use of hypnosis in 1980 or today.  Although Solan testified that nobody ever used hypnosis and he strictly forbade it, Mak testified that he was never instructed by Solan that hypnosis could not be used.  Finally, there were no written rules or regulations concerning the supervision of detectives.

According to Rothlein, where, as in the HPD in 1980, there were "no written protocols or rules concerning the proper manner to conduct investigations . . . then the first line supervisor and the investigators themselves will determine what the boundaries of acceptable practice should be."  Pl. Br., Exh. V, p. 20.

*13. Training in the HPD*

At the time of the investigation in this case in the HPD, there was no training occurring concerning conducting criminal investigations generally or, more specifically, training regarding conducting identification procedures and documenting criminal investigations other than informal on-the-job training.  There was no formal on-the job training program in the HPD prior to 1985.

Although Solan testified that he himself kept up to date with the department cases which discussed when an identification procedure would be unduly suggestive, he did not feel a need to relay this information to detectives under his command because "detectives learned off of older detectives that had been there before me. This was common knowledge. I mean, this was -- identification procedure is so common. I mean, it's not something that I have to sit there and tell my detectives, you know, get six pictures that are similar and make sure they're all the same race. I mean, we don't have to go to 101 academics here. They knew this stuff, Counselor." Pl. Br., Exh. H, p. 78.

There was no specific training for lieutenants in 1981 concerning supervising detectives or officers. Although Solan claimed a person by the name of Al Uzis was training detectives, according to Lieutenant Seaman, Uzis never provided any formal training or supervision to detectives or supervisors.

> According to Rothlein,
>
> On-the-job training is very important and an acceptable method of teaching new investigators the basics of how to investigate criminal activity. This training, however, has to be supported by written policies and procedures, which the investigators can refer to for guidelines. Without those guidelines, the new investigators are trained based upon the advice of their training officer, who may or may not be training them to handle their duties appropriately. Without the guidelines, and without close supervision, there exists no check and balance on their investigative procedures.

Pl. Br., Exh. V, p. 19. Rothlein also opined:

> It is apparent that the investigators assigned to the detective division only received on-the-job training and were not even provided with a procedure manual on the proper manner to handle their investigations . . . . The command staff of the

Hammond Police Department failed to provide adequate policies, training, and procedures to ensure the officers under their command were handling their duties in an acceptable manner.

*Id*. at 21.

### 14. *HPD Policy on Hypnosis*

The HPD had no written rules or regulations concerning the use of hypnosis in 1980 nor today. Solan testified that he strictly forbade his detectives from using hypnosis before the Jaynes investigation and told them that it would not be admissible in criminal proceedings. However, there was no written regulation forbidding it. It was possible that detectives were unaware of this policy.

Indeed, Solan acknowledged that after Myszak had gone to his hypnosis training for criminal investigators class, on another occasion other officers had used hypnosis in the Pucalik case. After Solan found out about the hypnosis session in the Pucalik case, he spoke with Vanes, who advised him not to use hypnosis in HPD criminal investigations because any evidence elicited from it might not be admissible.

Myszak testified in a deposition taken by Hill's attorney in April 2005 that there was "no department policy saying I could not" use hypnosis. Detective Mak was not aware of any rule or prohibition against using hypnosis and never heard Solan say anything about the use of hypnosis.

According to former assistant chief of the HPD Steven Ridgely, Myszak kept his hypnosis equipment out in the open in his office. He further testified that Solan was aware of this and that if Myszak was conducing hypnosis on the job, it had to have been allowed by Solan.

Although the HPD claims not to have paid for Myszak's hypnosis training due to budget constraints, Myszak learned of this training because it was posted on the bulletin board of the HPD. Myszak's certificates were placed in his personnel file.

### 15. *Disclosure of Exculpatory Material in the HPD*

According to Rothlein, a police officers' duty to disclose exculpatory and impeachment evidence to the prosecutor was well understood before 1980. Fleming acknowledged that he understood that as a Chicago Police Department detective he was required to provide all exculpatory and impeachment evidence to the prosecutor and that if he had any doubt as to whether evidence was exculpatory he was obligated to provide it to the prosecutor and to let the prosecutor determine whether to disclose the evidence to the defense.

Solan understood it was essential to take a broad view of what constituted exculpatory or impeachment evidence and to provide all evidence to the prosecutor so the prosecutor could determine whether particular evidence need be disclosed to the defense. When asked whether he ensured that the detectives under his supervision followed the same rule, he initially said, "Well, I wouldn't know," but then said that he believed his detectives were also so informed although "I wasn't there sitting next to them to see if they did it." Pl. Br., Exh. H, p. 48.

### 16. *The HPD Hierarchy and Individual Defendants*

Frank Dupey was the HPD chief of police from 1976 to 1984. As chief of police, Dupey understood that it was his responsibility, through the chain of command, to ensure that all divisions were properly performing their duties and responsibilities and to ensure they were protecting the

constitutional rights of those with whom they came into contact. Ultimately, through the chain of command, Dupey was responsible for ensuring that detectives received adequate training, including training in constitutionally adequate law enforcement practices concerning hypnosis, identification procedures and the production of exculpatory evidence.

In 1980, the HPD had thirty or more detectives and approximately 200 officers. Below Dupey in the chain of command was an assistant chief, four captains, including one who supervised the detective squad, and four lieutenants.

Prior to 1976, Dupey worked as a court officer in traffic court responsible for handing out subpoenas and regulating court appearances for police officers, and prior to 1967, Dupey was a patrol officer. Prior to becoming chief of police, Dupey had no supervisory experience or responsibilities, he had never supervised a single police officer, he had never worked as a detective, and he had never investigated a rape or homicide.

Dupey acknowledged that he was not qualified to directly supervise detectives and thus had to completely rely on the captains and lieutenants to ensure proper functioning of the detective unit. Dupey had no idea what a detective's responsibilities were in regard to disclosing exculpatory or impeachment evidence to a prosecutor, requirements concerning identification procedures, or requirements regarding documenting criminal investigations. Dupey had no idea what training if any was being provided to detectives through the training division although he acknowledged it was his responsibility. Dupey understood that officers were required to receive in-service training on an annual basis either from the training division or an outside source. He assumed, but did not actually know, that all training was supposed to be consistent with the rules and regulations of the department and he would never send a detective to an in-service training course that was

inconsistent with the department's rules and regulations. Dupey understood that supervisors in the detective bureau were monitoring training and to the extent any supervisor felt training was inconsistent with the mission of the department, that training would not be provided.

Dupey did not apply for the position of chief of police. He was appointed by then Mayor Ed Raskosky who called him and asked him if he wanted to be chief and Dupey accepted. Raskosky had been a judge, and Dupey was his court room clerk. Dupey and Raskosky were close friends and Dupey's "whole family" worked on the Raskosky campaign for mayor. Nobody ever questioned Dupey's qualifications to be chief.

Despite his lack of qualifications and experience concerning detectives and criminal investigations, Dupey appointed O'Drobinak as the captain responsible for detectives because they had been partners as patrol officers years before and he believed he was capable for the position.

After appointing O'Drobinak, Dupey gave him full discretion to run the detective division as he saw fit and did not provide any direct oversight over O'Drobinak or the detective division. Solan was appointed to be a lieutenant in the detective division by Chief Dupey at the chief's discretion. Seaman, another lieutenant in the detective division, was appointed by Dupey without an interview. Dupey had no idea what supervision or training O'Drobinak provided to the detective division and, as far as Dupey knew, there may have been no training or supervision by O'Drobinak. The lieutenants were responsible for supervising the detectives on the day-to-day casework, and the captain duties were administrative and not involved in day-to-day supervision.

O'Drobinak gave his Lieutenants, who were Solan and Seaman, complete discretion concerning the manner in which they supervised investigations, including how cases were to be documented. As of 1981, there was no formal evaluation of detectives.

Solan did not sign off on or even review all reports in a case file. He did not review all Q&A's of victims in rape cases, and he did not sign off on reports concerning eyewitness identifications. Solan did not provide any direct supervision to officers with regard to how and when to conduct identification procedures, noting that it was common knowledge. In the Jaynes case, although he was involved in the recommendation to prepare a probable cause affidavit for Mayes' arrest, he did not conduct a review of the case file prior to an affidavit being filed, and in his view it was completely within the discretion of detectives Mak and McPhillips to act on whatever amount of evidence they believed to be sufficient for probable cause.

The only time Seaman ever reviewed reports was at the end of the case when he got the whole file. Seaman's method of supervision was to trust that experienced detectives would do their jobs and then he would simply look at case files after a case was completed. Seaman agreed that pursuant to this method of supervision, if a detective failed to document a piece of exculpatory evidence he would probably not know about it. He took no affirmative steps to ensure that his detectives were complying with *Brady*, but simply trusted they understood and were complying with their obligations. Seaman had never heard of the term "*Brady*" and had no idea what it meant.

According to Rothlein, "[t]he first-line supervisor in a law enforcement agency is directly responsible to ensure that the officers under his/her command are completing their work properly and in accordance with the rules and regulations of the agency[, and] . . . . it is the responsibility of the upper command staff to establish the boundaries of acceptable behavior and general parameters of performance." Pl. Br., Exh. V, p. 19.

Rothlein found that "Chief Dupey and the command staff of the Hammond Police Department failed in their responsibilities to provide sufficient training, as well as written policies,

procedures, and direct supervision to ensure the officers and supervisors under their command were handling their investigations in accordance with minimally acceptable police practice," and regarding Chief Dupey in particular, "[i]t appears he was not qualified to supervise the Hammond Police Department and explains how an investigation such as this case, became such a colossal failure." Pl. Br., Exh. V, p. 22.

Regarding Solan, Rothlein concluded that what Solan considered "acceptable practice" for the HPD was "contrary to any department procedure" he ever encountered, was "not defensible" and that leadership of the HPD permitted Solan to establish and employ procedures in this case that "were inconsistent with the basic principles of conducting investigations." Pl. Br., Exh. V, p. 22.

During the relevant time period in this case, Solan supervised Townsell, Ratajczak, and Myszak. Solan testified that Townsell, the lead investigator in the case, and Myszak, the detective who conducted the hypnosis session and lineup, were both excellent detectives who were both careful and precise in the work that they did, including in their record keeping.

Solan prided himself on being a detail-oriented meticulous supervisor and detective and acknowledged that he was involved in both the investigation and trial of Mayes. Solan was "very knowledgeable" about everything that took place during the Jaynes investigation, and that is one of the reasons why he was asked to sit with the prosecutor and to assist him at Mayes' trial. Pl. Br., Exh. H, p. 121-22, 32-33. According to Vanes, Solan was the de facto lead detective at trial, and he would have expected Solan to know the steps taken by his detectives during the investigation.

## C. Motion for Summary Judgment–Raymond Myszak

Mayes has sued Myszak in his individual capacity in Counts I (§ 1983 4th Amendment claim), II (§ 1983 14th Amendment denial of fair trial claim), Count V (false arrest and false imprisonment under Indiana law), and Count VI (Intentional Infliction of Emotional Distress under Indiana law). In his motion for summary judgment, Myszak argues that he is entitled to qualified immunity on Mayes' due process claim as well as on Mayes' Fourth Amendment claims, that he is entitled to absolute immunity for any claim based on his deposition testimony, that the lineup of Larry Mayes cannot serve as the basis for Mayes' due process claim that he was denied a fair trial, and that the Indiana Tort Claims Act bars the state law claims made against Myszak in his individual capacity.

Mayes responds to each argument in turn, with the exception of the Fourth Amendment claim. Accordingly, the Court grants summary judgment in favor of Myszak on Mayes' Fourth Amendment claim in Count I of the Amended Complaint. The Court turns to each of Myszak's defenses in turn.

### 1. Absolute Immunity

"[W]hen a witness commits perjury, he or she is granted absolute immunity from civil liability." *Manning v. Miller*, 355 F.3d 1028, 1034 (7th Cir. 2004) (citing *Briscoe v. Lahue*, 460 U.S. 325, 331-32 (1983); *see also Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003). The Seventh Circuit extended this absolute immunity to deposition testimony. *Nwoke v. Plamer*, 116 Fed. Appx. 761, 763 (7th Cir. 2004). However, the fact that a defendant has perjured himself does not immunize him for other actions or inactions he has taken in relation to the case. *See Ienco v.*

*City of Chi.*, 286 F.3d 994 (7th Cir. 2002). Mayes' claims are not simply based on Myszak's 1982 deposition testimony and his alleged perjury but also that Myszak failed to disclose the hypnosis at the time of the hypnosis, at the time of the lineup, or in the years following the deposition and Mayes' conviction. Myszak agrees in his reply brief that he is not entitled to absolute immunity.

*2. Qualified Immunity*

The qualified immunity inquiry is two-fold. First, a court must determine whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?" *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, the court must determine if the right was clearly established at the time of the violation. *Id*.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant a fair trial. *See, e.g., Mooney v. Holohan*, 294 U.S. 103 (1935). In order to ensure that this right is protected, the United States Supreme Court, in *Brady v. Maryland*, held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Court subsequently held that "the duty to disclose such evidence is applicable even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985); *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

In order to constitute a violation of *Brady*, the withheld evidence must be "material." The Supreme Court has been clear that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Rather, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 433 (quoting *Bagley*, 473 U.S. at 678). Moreover,

> [t]he second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles*, 514 U.S. at 434-35. In determining the value of suppressed evidence, the evidence must be "considered collectively, not item by item." *Id.* at 435.

The obligation to produce exculpatory or impeaching evidence extends to materials which are "known only to police investigators and not to the prosecutor." *Strickler*, 527 U.S. 280-81 (quoting *Kyles*, 514 U.S. at 438). When a police officer prevents the prosecutor from complying with his duty to produce exculpatory or impeaching evidence, by failing to disclose such evidence to the prosecutor, then the officer violates his obligations under *Brady* and is liable to the criminal

defendant for violating his rights under the Due Process Clause of the Fourteenth Amendment. *See Newsome v. McCabe*, 256 F.3d 747 (2001). "It is possible for police no less than prosecutors to violate the due process clause by withholding exculpatory information." *Newsome v. McCabe*, 260 F.3d 824, 825 (7th Cir. 2001) (supplemental opinion on petition for rehearing). In such a situation, the officer himself has caused the due process violation:

> If officers are not candid with prosecutors, then the prosecutors' decisions–although vital to the causal chain in a but-for sense–are not the important locus of action. Pressure must be brought to bear elsewhere. Prosecutors kept in the dark by the police (and not negligent in failing to hire other persons to investigate the police) won't improve their performance with or without legal liability for their conduct. Requiring culpable officers to pay damages to the victims of their actions, however, holds out promise of both deterring and remediating violations of the Constitution.

*Newsome*, 256 F.3d at 752.

"[I]f the right characterization of the defendants' conduct is that they deliberately withheld information, seeking to misdirect or mislead the prosecutors and the defense, then there is a genuine constitutional problem." *Newsome*, 260 F.3d at 824.[9] However, the "police need not spontaneously reveal to prosecutors every tidbit that with the benefit of hindsight (and the context of other evidence) could be said to assist [the] defendant[]." *Id*. at 824.

Myszak asserts that he did not violate his duties to Mayes under *Brady* because there is no evidence that he deliberately withheld evidence regarding the hypnosis session with Ms. Jaynes and

---

[9]Whereas Mayes argues that no Supreme Court or Seventh Circuit precedent requires a showing of "bad faith" to establish liability by a police officer for failing to disclose exculpatory evidence to the prosecution, Solan asserts that the intention to deprive the defendant of fair trial equates with "bad faith," citing *California v. Trombetta*, 467 U.S. 479 (1984); *Arizona v. Youngblood*, 488 U.S. 51 (1988); *Jean v. Collins*, 221 F.3d 656, *Villasana v. Wilhoit*, 368 F.3d 976 (8th Cir. 2004); *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001). As noted by Mayes, both *Trombetta* and *Youngblood* apply a "bad faith" standard to an officer's failure to *preserve Brady* material but do not address the failure to disclose known, extant impeachment or exculpatory evidence. As the Seventh Circuit has not adopted the term "bad faith" for the intent requirement, the Court will rely on the language set forth by the Seventh Circuit that the officer "deliberately withheld information, seeking to misdirect or mislead the prosecutors and the defense." *Newsome*, 260 F.3d at 825.

because the session was not "material" to Mayes' prosecution. The Court first considers whether the evidence of record supports the inference asserted by Mayes that Myszak deliberately withheld the fact of the hypnosis from the prosecutor in the Jaynes investigation.

Myszak was not assigned to investigate the Martin Station rape and robbery; rather, the detectives assigned to the case were Townsell and Ratajczak. Prior to the hypnosis session, Ms. Jaynes had face-to-face discussions with detectives about the possibility of undergoing hypnosis to help her remember the license plate number of the car and with the description and identification of the attackers. Sometime prior to October 19, 1980, having made the decision to be hypnotized, Ms. Jaynes and her father went to the Hammond police station knowing that she was going to be hypnotized. As Myszak walked into the police station for his shift that day, Townsell yelled to Myszak down the hallway, "Here comes the Department hypnotist now." Myszak states in his civil deposition that he was then asked by Townsell to hypnotize Ms. Jaynes but that he refused, explaining that Solan had told him he could not use hypnosis for police work and that the product of the hypnosis might be inadmissible, but eventually agreeing to relax her. The session then took place.

On February 13, 1981, Myszak conducted the lineup for Ms. Jaynes, at which she ultimately identified Mayes after having first identified a different individual.

At his criminal proceedings deposition on January 25, 1982, Myszak was asked a series of questions regarding his involvement in the Jaynes investigation:

> Q: When did you become involved with the robbery of the Martin Service Station in Hammond?
> A: I conducted a lineup in reference to that–In reference to that robbery, I conducted a lineup.

Q. Other than that lineup involving Larry Mayes, did you become involved in any other way with the investigation involving Lisa Jaynes?
A. I need something more specific than that, Counselor.

Q. Did you do any investigative work involving the case?
A. It's too general of a statement. I can't answer that.

Q. So you didn't work on this case at all?
A. I conducted the lineup.

Q. When was the first time you talked with Lisa Jaynes, if you recall?
A. I can't recall.

At his deposition in this civil case, approximately twenty years later, Myszak testified that he did not mention the hypnosis session during his 1982 criminal proceedings deposition because he "didn't recall the session." He also testified that he did not remember Ms. Jaynes as being the person that he had hypnotized in October 1980 when he conducted the lineup with her in February 1981.

Myszak offers these statements in support of his motion for summary judgment, arguing that there is no evidence of record that he intentionally withheld the fact of the hypnosis from the prosecution. In opposition to summary judgment, Mayes has not come forward with specific facts demonstrating Myszak deliberately withheld the fact of the hypnosis from the prosecution. Rather, he relies on inferences drawn from the events just described, and the inferences drawn by Mayes are too attenuated and speculative to defeat summary judgment. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (holding, in setting out the summary judgment standard, that "'we are not required to draw every conceivable inference from the record,'" and "'mere speculation or conjecture' will not defeat a summary judgment motion") (quoting *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 591 (7th Cir. 1997)).

First, Mayes infers from the facts above that Myszak knew prior to that meeting that he would be hypnotizing Ms. Jaynes. However, any such inference is not reasonably drawn from the facts of record, which simply support that Myszak walked into work that day and was approached by Townsell to conduct the hypnosis. Nor is there any evidence or reasonable inference from the facts of record to support Mayes' conjecture that Townsell and Mayes conspired to conceal the hypnosis session. Mayes also infers that Myszak deflected questions or lied at his criminal proceedings deposition when he did not reveal the hypnosis because it is incredible that Myszak did not remember that he had hypnotized Ms. Jaynes during the criminal proceedings deposition when she is the only person he hypnotized for police work, because the session lasted at least an hour, and because he remembered the hypnosis session twenty years later when questioned by Solan about it in relation to this civil case. Such conclusions are mere speculation and do not refute Myszak's testimony that he did not make a connection between the person he hypnotized in October 1980 and the person for whom he conducted a lineup in February 1981 and that his focus during that criminal proceedings deposition was the lineup as that is what he had been prepped for by the deputy prosecutor. It is not unbelievable that Solan could independently remember the hypnosis and specific details of the hypnosis twenty years later but not have raised it in his 1982 deposition because he did not identify Ms. Jaynes, for whom he had conducted the lineup, as the person he had hypnotized. There is no other evidence of record to refute Myszak's deposition testimony. A rational trier of fact could not come to the conclusions asserted by Mayes.

Because the evidence of record cannot support an inference that Myszak deliberately withheld the fact of the hypnosis, a determination of whether the hypnosis session was material for *Brady* purposes is unnecessary. Similarly, under the qualified immunity analysis, having found that

the first prong was not met, the Court need not proceed to determine whether the constitutional right was clearly established at the time.

*3. The Lineup*

Myszak also seeks summary judgment on Mayes' due process claim that he was denied a fair trial based on the February 3, 1981 lineup.  Both parties agree that "[t]he Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality," *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006), but that "[i]t does, however, guarantee the right to a fair trial–in this context, via the due process clause of the Fourteenth Amendment–and that right is violated if unduly suggestive identification techniques are allowed to taint the trial," *id*.

Myszak argues that there is no evidence that the lineup tainted the trial, noting that Mayes' defense attorney at the time had ample notice regarding the circumstances surrounding the lineup, having been present at the lineup; that both Myszak and Ms. Jaynes testified that Ms. Jaynes had initially picked "No. 5", but then picked "No. 4" after having slowed down and taken another look; that the lineup report, which reflected the switch, was admitted into evidence; and that the trial court did not exclude the testimony or the exhibit.

Mayes' response, however, is that it is the lineup, in the context of the other suggestive procedures that came before it, that caused the lineup to have tainted his trial.  Mayes singles out the alleged improper photo array done by Townsell, the hypnosis of Ms. Jaynes, the hypnosis' subsequent concealment, the subsequent identification by Ms. Jaynes with Mak and McPhillips, and the lineup itself.  As for the lineup, Mayes argues that it was improper when Myszak, who had

previously hypnotized Ms. Jaynes, grabbed her arm, told her to come back into the room to look around again, and asked if she wanted each of them to say something so that Mayes gold tooth was visible, after which Ms. Jaynes identified Mayes. Mayes reasons that the facts of the photo array and the fact that Myszak had previously hypnotized Ms. Jaynes were not disclosed to defense counsel at trial.

Nevertheless, for the purposes of determining Myszak's liability in this action, the Court has already determined that the facts do not support an inference that Myszak deliberately withheld information about the hypnosis and that Myszak has testified that he did not recognize Ms. Jaynes at the time of the lineup as the person he had hypnotized months earlier. Therefore, whether the lineup tainted the trial cannot be a basis for a claim against Myszak individually. The Court grants summary judgment in favor of Myszak as an individual on this claim.

### 4. Indiana Tort Claims Act

Myszak asserts that, under Indiana Code § 34-13-3-5(b), Mayes' state law claims against him personally are barred. Mayes responds that he is not pursuing his false arrest claim against Myszak and that, notwithstanding § 34-13-3-5(b), a police officer is liable under § 34-13-3-3(8) when acting within the scope of his employment when his actions constitute false imprisonment.

The code provisions at issue provide:

> A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment.

*Id*. § 34-3-3-3(8).

A judgment rendered with respect to or a settlement made by a governmental entity bars an action by the claimant against an employee . . . whose conduct gave rise to the claim resulting in that judgment or settlement. A lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally.

Ind. Code § 34-13-3-5(b).

The Indiana Supreme Court has held that Indiana Code § 34-13-3-5(b) "should be interpreted as standing for the proposition that a plaintiff cannot sue a governmental employee personally if the complaint, on its face, alleges that the employee's acts leading to the claim occurred within the scope of his employment." *City of Gary v. Conat*, 810 N.E.2d 1112, 1118 (Ind. Ct. App. 2004) (citing *Bushong v. Williamson*, 790 N.E.2d 467, 471 (Ind. 2003)). In *Bushong*, the court explained that the Indiana Tort Claims Act, under § 34-13-3-3, provides substantial immunity for conduct occurring within the scope of employment, 790 N.E.2d at 472, and, as relied on by Mayes, one such immunity is for the enforcement of a law *unless* the enforcement constitutes false arrest or false imprisonment. Thus, Mayes reasons that Myszak can still be sued for false imprisonment. However, pursuant to *Bushong*, § 34-3-3-3 does not trump § 34-3-3-5(b), rather, *Bushong* indicates that § 34-3-3-5(b) provides another species of immunity, commensurate with those enumerated in § 34-13-3-3, that allows employees to carry out their duties without fear of litigation and, more specifically, without being personally liable for their actions. *Bushong*, 790 N.E.2d at 472. As Mayes has alleged that Myszak was acting within the scope of his employment at the time of the alleged unconstitutional actions, these state law claims cannot be brought against him personally. Accordingly, the Court grants summary judgment in favor of Myszak on Mayes' state law claims.

Notably, the immunities enumerated in § 34-13-3-3 apply to both the governmental entity and the employee sued for the employee's actions within the scope of his employment, and, thus,

although an employee may not be sued personally for acting within the scope of his employment under § 34-13-3-5(b) and *Bushong*, it is possible that the governmental entity may still be sued for such action and would remain entitled to the immunity under § 34-13-3-3. Or, when false arrest or imprisonment are alleged, the governmental entity would not be entitled to immunity. *See* § 34-13-3-3(8).

### D. Motion for Summary Judgment–Michael Solan

Mayes has brought suit against Solan in his individual capacity in Count I (§ 1983 4th Amendment claim), II (§ 1983 14th Amendment denial of fair trial claim), Count V (false arrest and false imprisonment under Indiana law), and Count VI (Intentional Infliction of Emotional Distress under Indiana law) and against Solan in his individual and official capacities in Count III (supervisory liability). In his motion for summary judgment, Solan asserts that summary judgment is appropriate in his favor on the basis that he is entitled to absolute immunity for his role at Mayes' trial, that he had no involvement with the lineup, that Solan was at most negligent in not following up on Townsell's statement that the October 6 identifications were tentative, that Solan had forbidden Myszak to use hypnosis, that there is no evidence that Solan either fabricated or intentionally excluded exculpatory evidence leading to the arrest of Mayes, that he is entitled to qualified immunity, that he was not deliberately indifferent in his supervision of Townsell and/or Myszak, and that Mayes' state law claims are barred by Indiana Code § 34-13-3-5.

Mayes responds to each argument in turn. Solan did not file a reply brief.

*1. § 1983–Personal Liability for Failure to Disclose Exculpatory Evidence*

Mayes has alleged that Solan personally violated his due process right to a fair trial by failing to disclose the "tentative" October 6 identification, which was material, impeachment, and exculpatory evidence, and by failing to disclose the hypnosis. However, Mayes does not allege that Solan had any direct involvement in the lineup conducted by Myszak. Mayes asserts in his response brief that, although knowledge of the hypnosis strengthens the *Brady* violation against Solan, Solan's liability for violating Mayes' due process right to a fair trial does not depend on a jury determination that Solan knew of the hypnosis.

a. Absolute Immunity

In his defense, Solan first argues that, because a non-prosecutor performing prosecutorial functions has absolute immunity from civil actions, citing generally *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000), Solan is entitled to the absolute immunity of a prosecutor for what he did or failed to do in assisting the prosecutor in the courtroom during Mayes' criminal trial. *Jean*, a six to six en banc decision, does not support this proposition.[10] A prior, vacated opinion in the case does contain the suggestion that police officers have no duty under *Brady* to supply exculpatory material directly to defense counsel, as opposed to the prosecution, and that they would be entitled to absolute immunity if there were such an obligation. *See Jean v. Collins*, 155 F.3d 701 (4th Cir. 1998). However, this prior opinion is no longer good law as it was vacated by the Supreme Court. *See Jean*

---

[10] The court in *Jean*, however, does recite the absolute immunity of prosecutors in the exercise of their prosecutorial duties in explaining why it declined to impose a sweeping duty on police to disclose exculpatory evidence and in support of its adoption of the requirement of a showing of bad faith on the part of the police before liability may be imposed for a failure to disclose exculpatory evidence.

*v. Collins*, 526 U.S. 1142 (1999). Moreover, such disclosure directly to the defense is not an issue raised in the instant litigation.

In addition, Mayes' allegation is not that Solan's failure to disclose exculpatory material to the prosecution is solely (or even primarily) based on his conduct while he sat at the counsel table as lead detective, but rather on his continuing failure to disclose to the prosecutor material impeachment and exculpatory information known to him, specifically the "tentative" October 6 identification, as set forth in more detail below. Solan is not entitled to absolute immunity.

b. Personal Liability for Failing to Reveal the October 6 Identification as Tentative

The Court applies the same standard for Solan's liability under *Brady* for the failure to disclose exculpatory evidence as set forth above in section C.2 addressing Myszak's liability. In sum, if Solan "deliberately withheld information, seeking to misdirect or mislead the prosecutors and the defense, then there is a genuine constitutional problem." *Newsome*, 260 F.3d at 824. In addition, the withheld evidence must be "material" such that there is a "'reasonable probability' of a different result shown when the government'/s evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). Solan moves for summary judgment on the basis that he did not violate *Brady* because he did not deliberately withhold the information. Solan also argues that this insufficient evidence for a finding that Solan's failure to disclose this fact resulted in an unfair trial for Mayes. At the summary judgment stage, the Court must consider the facts in the light most favorable to Mayes.

In his deposition, Solan revealed that Townsell told him in the days after October 6 that he had a "tentative identification" in this case. For the purposes of Solan's liability, Mayes asserts that

whether Ms. Jaynes herself was actually tentative in making the identification, i.e., in identifying a photograph of the true perpetrator, is ultimately irrelevant for the purposes of Mayes' claims concerning the withholding of impeachment and exculpatory evidence, because the fact that Townsell described the identification as "tentative" to Solan is itself impeachment material, which is required to be disclosed under *Brady*. This failure to disclose undermines confidence in the outcome of Mayes' trial, and thus is material, because the description by Townsell that the identification was tentative provides an explanation for Townsell's failure to document the identification and would have undercut both Townsell's and Ms. Jaynes' trial testimony that the identification was positive.

Solan's obligation to disclose the tentative identification (*or* to ensure that his subordinate, Townsell, did so) first arose when he learned the fact, and it was heightened when he learned (at least by November 1980 during the Mak and McPhillips investigation) that Townsell had never documented the identification procedure with Ms. Jaynes. Defendants' police practices expert, Fleming, conceded that based upon a review of Solan's sworn testimony, Solan had an obligation both individually and as Townsell's supervisor to ensure that this evidence was provided to the prosecutor. As to his intent, during his criminal proceedings deposition, Solan did not reveal that Townsell had described the identification as tentative when asked when Ms. Jaynes first identified Mayes, instead answering, "You'll have to talk to Sergeant Townsell." Pl. Br., Exh. JJ, p. 217. In his civil deposition, Solan stated that he knew at the time that he gave the criminal proceedings deposition that Townsell had described the identifications as tentative and he did not know why he did not disclose that information during the criminal proceedings deposition. Further probative of Solan's intent in withholding material impeachment and exculpatory evidence is Solan's

participation in Mayes' criminal trial. In his role as lead detective, seated next to Vanes in the courtroom, Solan was unquestionably put on actual notice that Townsell failed to disclose the tentative identification during his testimony at trial when he described the identification as positive. Solan has not suggested that he did not hear Townsell make these statements at trial, yet Solan again failed to disclose the tentative identification to Vanes as he sat in trial and heard this testimony.

Solan argues that, as expressed in his civil deposition testimony, his understanding of Townsell's statement that the identifications were "tentative" was that Townsell was only seeking to confirm Ms. Jaynes' identification of Mayes by finding the possessor of the gold tooth. However, Solan also testified that he had "no idea" what Townsell meant by characterizing Ms. Jaynes' identification as tentative, that he never inquired, and that he understood tentative to mean no absolute identification such as "I think that's him, I'm not sure," "This is him. I'm not positive," "I'd like to see him in person." Pl. Br., Exh. G, at 204. Solan understood Townsell to mean that 'he had no absolute identification." *Id*. at 126-27. He further stated that "[t]entative identifications happen all the time. This is nothing that is shocking that'd come to a supervisor and say." *Id*. Solan also admitted that he believed the first positive identification of Mayes was on November 17.

Solan further argues that his failure to disclose the identifications is immunized by Mak and McPhillips' November 17 supplemental report, which included a reference to the October 6 identifications, and which was issued before Townsell reported back to Solan. From this, Solan reasons that Mayes' defense counsel had access to the alleged exculpatory material. However, in contrast with *Villasana v. Wilhoit*, 368 F.3d 976, 978 (8th Cir. 2004), in which the court found no *Brady* violation because the criminal defense counsel learned of the existence of a lab technician's exculpatory notes but did not follow up, Mayes' defense counsel never learned that the October 6

identifications were *tentative*. The disclosure of the October 6 identifications through Mak and McPhillips' supplemental report on November 19, 1980, only revealed the identification, not Townsell's characterization of them to Solan as "tentative." Moreover, there were no notes or documentation by Townsell following the October 6 identification and, thus, no indication that the identifications were tentative that would have flagged the issue for the defense.

Solan suggests in his motion that Townsell "merge[d] his documentation into the Mak and McPhillips supplemental report," Solan Br., p. 19, and that Solan and Vanes found that appropriate. However, the evidence favorable to Mayes indicates that Townsell never reviewed Mak and McPhillips' report and, therefore, he could not have adopted the report nor could he have had any idea whether it adequately documented the October 6 identification procedures. A review of Mak and McPhillips' report reveals that it discloses neither the multiple pictures of Mayes in a single array that were shown to Ms. Jaynes on October 6 or that the identification was tentative.

Based on the developed factual record before the Court, the Court finds that Mayes has raised a triable issue of fact as to whether Solan deliberately withheld from the prosecutor the statement by Townsell that the October 6 identifications were tentative and that failure to disclose was material. Accordingly, the Court denies Solan's motion for summary judgment as to Count II of Mayes' Amended Complaint based on Solan's failure to disclose the October 6 identification as tentative.

c. Personal Liability for Failing to Disclose the Hypnosis

Solan argues that it is undisputed that he did not learn of the hypnosis until 2004. He asserts that the only time that he was in the company of Townsell and Ms. Jaynes was on October 6, 1980,

that the record demonstrates that Solan was not present during the hypnosis, and that Solan had forbidden Myszak to use hypnosis in criminal investigations after Solan learned that Myszak was taking a course in forensic hypnosis. As a result, Solan contends that Mayes cannot show that Solan knew anything about the hypnosis of Ms. Jaynes at the time and, thus, cannot demonstrate a deliberate failure to reveal the hypnosis to the prosecutor. Mayes responds in one short paragraph that it is reasonable to infer that Solan was aware that Ms. Jaynes was hypnotized and that he had a duty to reveal this to the prosecutor as generally demonstrated by his statement of facts, without reference to any specific facts.

The evidence of record, viewed in the light most favorable to Mayes, does not demonstrate that Solan was aware in general, or specifically in this case, that Myszak was hypnotizing people in criminal investigations. Rather, the evidence reveals that Mayes' expert, Rothlein opined that, other than the deposition testimony of Ridgely, he had reviewed nothing that showed Myszak or accuses Myszak of practicing hypnosis in the HPD. Myszak testified that Solan had forbidden him to use hypnosis in criminal investigations, and Solan testified that the use of hypnosis was forbidden as a matter of City policy during the time of the events in question. Solan testified that he was involved with the Hammond police detectives on a close enough basis from 1980 that if hypnosis had been used by anyone on the detective squad, he was confident he would have known about it, and he testified that if there was any evidence of the use of hypnosis beyond the alleged hypnosis in this case, it would shock him. Ridgley testified that everyone knew that Myszak had his hypnosis equipment out in the open, but there is no admissible testimony that anyone knew that Myszak was conducting hypnosis or that Solan was aware of it. Nor is there any testimony that Solan was actually aware of the Jaynes hypnosis.

71

Accordingly, the Court finds that there is not a genuine issue of material fact as to whether Solan knew of the hypnosis of Ms. Jaynes and then deliberately failed to disclose it to the prosecutor. The Court grants Solan's motion for summary judgment on Count II of Mayes' Amended Complaint which alleges that Solan failed to disclose the hypnosis to prosecutors in violation of his *Brady* duty.

d. Qualified Immunity[11]

As set forth in Part C.2 above in relation to Myszak, the qualified immunity inquiry is two-fold. First, the Court considers whether, when taken in the light most favorable to Mayes, the facts alleged show that Solan's conduct violated a constitutional right. *Crull*, 384 F.3d at 460. Second, the Court must determine if the right was clearly established at the time of the violation. *Id*.

It appears from Solan's motion that he is only asserting qualified immunity as to the claim based on the failure to disclose the hypnosis, arguing that Mayes cannot prove that the nondisclosure was material and that the right to disclosure of hypnosis testimony gained subsequent to an independent identification by the same witness was not clearly established in 1982. As set forth above, the Court has found that the facts viewed in the light most favorable to Mayes do not demonstrate that Solan violated Mayes' constitutional right based on a failure to disclose the hypnosis session. Therefore, the Court does not reach the second prong of the qualified immunity analysis.

To the extent that Solan may be asserting qualified immunity for the failure to disclose the "tentative" identification, the Court has already found that the facts alleged, taken in the light most

---

[11] Solan only raises the defense of qualified immunity as to his personal liability but does not raise it as a defense to the supervisory liability claim.

favorable to Solan, show that Solan's conduct violated a constitutional right, and the Court turns to the second inquiry. It was clearly established in 1980, 1981, and 1982, at the time of the investigation and trial in question, and when Solan allegedly withheld the fact of the "tentative" identification, "that police who deliberately withhold exculpatory evidence, and thus prevent the prosecutors from complying with the obligations articulated in *Brady*, violate the due process clause." *Newsome*, 260 F.3d at 824; *see also Jones v. City of Chi.*, 856 F.2d 985, 994-95 (7th Cir. 1988). "It was well established that investigators who withhold exculpatory evidence from defendants violate the defendant's constitutional due process right." *Manning*, 355 F.3d at 1034 (quoting *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985)). Accordingly, Solan is not entitled to qualified immunity.

*2. Supervisory Liability*

As to Mayes' claim of supervisory liability in Count III of the Amended Complaint, Solan argues that Mayes is unable to establish that Solan was deliberately indifferent in his supervision of Townsell or Myszak or that Solan was personally involved in their alleged unconstitutional acts, entitling Solan to summary judgment on this claim.

Mayes asserts this claim against Solan in both his official and individual capacities; however, Mayes has also named the City as a defendant. Because the City is responsible for the official actions of its policymaking officials, official capacity claims are "'merely another way of asserting a claim against the municipality.'" *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 479 n. 5 (7th Cir. 1997) (quoting *Gibson v. City of Chicago*, 910 F.2d 1510, 1519 n. 14 (7th Cir. 1990)).

Nevertheless, the Court will consider the supervisory liability claim against Solan in his individual capacity.

In *Monell v. Department of Social Services*, the United States Supreme Court expressly rejected *respondeat superior* as a basis to attach supervisory liability under a § 1983 action. 436 U.S. 658, 691-92 (1978). Thus, basing a claim of supervisory liability merely on a supervisor's right to control employees is insufficient. *Id.*; *see also Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). Rather, "§ 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in [the] alleged constitutional deprivation." *Galdikas v. Fagan*, 342 F.3d 684, 693 (7th Cir. 2003) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)); *see also Rizzo v. Goode*, 423 U.S. 362, 371 (1976) (requiring an "affirmative link" between the supervisor and the constitutional violations committed by his subordinates).

Proof that a supervisor was negligent or even grossly negligent in failing to detect or prevent constitutional violations is insufficient: "The supervisor must know about the conduct and facilitate it, condone it, or turn a blind eye for fear of what they might see. They must act either knowingly or with deliberate, reckless indifference." *Jones*, 856 F.2d at 991; *see also Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) ("[A] defendant's direct participation in [a] deprivation [of constitutional rights] is not required. An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent").

When a supervisor is on notice of a possible unconstitutional policy or custom and fails to take corrective measures, for example, by destroying incriminating documents or affirmatively commanding employees to continue unconstitutional acts, liability may attach. *See Wilson v. City of Chi.*, 6 F.3d 1233, 1240 (7th Cir. 1993); *see also Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (holding that "under certain circumstances a state actor's failure to intervene renders him or her culpable under §1983"). However, isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference. *See City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24; *Silvard v. Pulaski County* 17 F.3d 185, 188 (7th Cir. 1994). A failure to supervise does not hinge on actual notice of prior violations by subordinates but supervisory liability may arise under § 1983 when the supervisor disregards known or "obvious" risks of constitutional violations that would flow from a lack of supervision. *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 390 & n.10 (1989).

Solan asserts that there are no material facts of record indicating that he knew of an enhanced risk of constitutional injury, i.e., that he knew there were inappropriate identification procedures, reporting procedures, or interviewing procedures in the detective bureau. Solan relies on the fact that the detective bureau had never been cited for inappropriate identification procedures or a failure to reveal exculpatory evidence, that Solan's knowledge that Townsell had called the October 6 identifications "tentative" at best entitles Mayes to the inference that Solan was placed on inquiry notice of Townsell's activities, and that any such inferences twenty-five years later are purely speculative. Mayes responds that what makes the claims against Solan stand out from the typical "failure to supervise" case is the breadth of Solan's personal involvement in the misconduct that

permeated the Jaynes investigation and that his supervision, or lack thereof, was by his own admissions largely consistent with HPD custom and practice but yet constitutionally deficient.

Mayes alleges that he was deprived of his right to a fair trial. As discussed more fully in Part E below, addressing the City's motion for summary judgment, the Court finds that Mayes has raised an issue of triable fact as to whether the actions of the officers deprived Mayes of his due process right to a fair trial by withholding material exculpatory and impeachment evidence and by engaging in unconstitutionally suggestive identification procedures. Upon a review of the facts of record, viewed in the light most favorable to Mayes, there is a genuine issue of material fact as to whether Solan is individually liable in his supervisory role for the conduct of Townsell, Ratajczak, and Myszak by facilitating, approving, and condoning their alleged unconstitutional activity and thus personally causing Mayes to be deprived of his right to a fair trial.

Solan has acknowledged that he was aware in 1980 of investigators' responsibilities to document and disclose both inculpatory and exculpatory (and impeachment) evidence to the prosecutor, in order to comply with *Brady*, and that documentation of investigative activities by detectives was essential to ensure proper disclosure of exculpatory and impeachment evidence. As set forth more fully in the fact section, Plaintiff's expert, Rothlein, testified that "[t]he first-line supervisor in a law enforcement agency is directly responsible to ensure that the officers under his/her command are completing their work properly and in accordance with the rules and regulations of the agency." Pl. Br., Exh. V, p.19.

Notwithstanding Solan's knowledge of such responsibility, based on the facts in evidence, a reasonable jury could find that Solan failed throughout the Jaynes investigation to provide minimally acceptable supervisory oversight of his detectives. For example, and as discussed in more

detail above in Part B.1.b, when Townsell informed Solan in the days after October 6 that he had obtained a "tentative" identification, Solan did not inquire as to what Townsell meant by his use of the word "tentative."  Nevertheless, when Mak and McPhillips sought an arrest warrant six weeks later, based upon Ms. Jaynes having selected a photograph of Mayes that she had already been shown by Townsell, Solan asked no questions and made no effort to ensure that the prosecutor was aware that Ms. Jaynes' October 6 identification was tentative, despite his personal knowledge of this fact.  Although Solan himself acknowledged that a tentative identification was no identification at all, was clearly *Brady* material, and could not provide a basis for an arrest, the tentative nature of Ms. Jaynes' identification is nowhere disclosed in the November report prepared by Mak and McPhillips.

In his testimony, Solan stated that he did not review or sign off on all reports in a case file, did not review all Q&As of victims in rape cases, and did not sign off on reports concerning eyewitness identifications.  Nor did he provide any direct supervision to officers with regard to how and when to conduct identification procedures, and he stated that his detectives had complete discretion in this regard.  Moreover, Solan was not troubled by Townsell's and Myszak's conduct in the Jaynes investigation and testified that it was consistent with his supervision and HPD protocols.  For example, according to Solan, it was acceptable to show photographs to Ms. Jaynes before taking a statement from her; it was acceptable to show her multiple pictures of the same suspect, even after she selected one from an array, if Townsell believed that Ms. Jaynes had been wrong; it was appropriate not to take Ms. Jaynes' statement for almost six weeks after the crime if Townsell believed that Ms. Jaynes' identification was wrong, or if an identification was not positive; and it was appropriate not to document or disclose the hypnosis session conducted by Townsell and

Myszak–so long as Ms. Jaynes had not actually been hypnotized. Both Plaintiff's expert, Rothlein, and Defendants' expert, Fleming, opined that Solan's determination that such practices would be proper and acceptable investigative techniques is wrong.

There is additional evidence that raises a question of fact as to whether Solan created a permissive environment in which detectives felt free to conduct investigations in a manner in contravention of HPD policy and minimally accepted police practices. For example, Townsell deliberately violated Solan's directives and openly engaged in misconduct when he urged Myszak to hypnotize Ms. Jaynes even after being told by Myszak that Solan had expressly forbidden such conduct, and Myszak then agreed to do so. Such action would permit a jury to infer that instances of Solan's inadequate supervision in the Jaynes investigation were part of a long-standing and widely understood custom of acquiescence in misconduct by subordinates. In other words, there is a question whether Solan's lack of oversight provided Townsell the opportunity to plan and carry out, openly, the hypnosis session, such that Solan's supervision was constitutionally inadequate. Additionally, the evidence demonstrates that Townsell repeatedly stated in his testimony at Mayes' criminal trial that Ms. Jaynes had positively identified Mayes on October 6, notwithstanding that Solan was seated at the prosecutor's table and knew that Jaynes' identification had been tentative.

This evidence creates a genuine issue to rebut Solan's assertion that Mayes has adduced no evidence "indicating that Solan knew of an enhanced risk of constitutional injury, i.e., that he knew there were inappropriate identification procedures, reporting procedures, and interviewing procedures in the detective bureau." Solan Br., p. 23. The evidence could be viewed by a reasonable jury as indicating that Solan either took no steps to ensure that such compliance occurred, or affirmatively sanctioned unconstitutional investigative practices. *See Jones*, 787 F.2d at 204

(requiring "systemic" inaction). To clarify, it is not the fact that Solan was Townsell and Myszak's supervisor and thus had a duty to supervise them that is the basis of his liability but rather that Solan fostered an environment that facilitated minimally acceptable police practices of which he was aware and which he condoned and that he was personally involved in certain aspects of the alleged constitutional violations in this matter. This alleged failure to ensure that his investigators were adequately trained and to provide the proper supervision to ensure that minimally sufficient constitutional safeguards were in place is directly linked to the alleged constitutional violations in this matter, and a reasonable jury could find that Solan's permissive supervision was a moving force behind Townsell and Myszak's actions. Accordingly, the Court denies Solan's motion as to Mayes' claim of supervisory liability in Count III of his Complaint.

### 3. State Law Claims–Indiana Tort Claims Act

Like Myszak, Solan argues that he is entitled to summary judgment on Mayes' state law claims of false arrest, false imprisonment, and intentional infliction of emotional distress because Indiana law prohibits the filing of a state law claim against a government employee individually when the lawsuit alleges that the employee was acting within the scope of his employment, citing Indiana Code § 34-13-3-5(b), (c), and because Mayes has admitted that Solan was acting in the scope of his employment at all times. In his response, Mayes represents that he is not proceeding with his state law false arrest claim against Solan and agrees that Solan was acting within the scope of his employment at all times but maintains that Solan is not free from liability on the claim of false imprisonment under the Indiana Tort Claims Act, Indiana Code § 34-13-3-3(8). As set forth above in part C.4, under § 34-13-3-5(b), an employee acting within the scope of his employment cannot be

sued personally for such actions. Accordingly, the Court grants summary judgment in favor of Solan on Mayes' state law claims in Counts V and VII.

*4. Summary*

In summary and in accordance with the holdings set forth above, the Court denies Solan's motion for summary judgment as to Count II and Count III and grants Solan's motion as to Counts I, V, and VII.

## E.  Motion for Summary Judgment–City of Hammond

The City seeks summary judgment in its favor on two bases, arguing that Mayes is collaterally estopped from relitigating the holdings of *Mayes v. State* and that the City is not subject to § 1983 liability under *Monell*. Mayes responds that collateral estoppel is inapplicable as to the holdings of *Mayes v. State* and that the City is subject to liability under *Monell* because it had a widespread policy or custom of inadequate supervision and training that directly caused Mayes' constitutional deprivation.

*1. Collateral Estoppel*

The City asserts that Mayes is barred by the doctrine of collateral estoppel from relitigating the findings of the Indiana Supreme Court in his criminal case concerning the October 6 identification and the evidence of "consciousness of guilt." Specifically, the City posits that Mayes had a full and fair opportunity to argue these issues in *Mayes v. State*, that the issues were litigated and decided in *Mayes v. State*, and that the decision in *Mayes v. State* was explicitly concerned with

both the sufficiency and integrity of the evidence on appeal.  In his response, Mayes opposes all of these positions taken by the City and further argues that because his criminal convictions were vacated, there is no final, valid judgment upon which collateral estoppel may be predicated.

When applying principles of issue preclusion,[12] federal courts must afford full faith and credit to both criminal and civil state court decisions.  28 U.S.C. § 1738.  Further, the United States Supreme Court mandates that the preclusive effect of state court judgments in § 1983 actions is governed by the law of the state from which the judgment issued.  *See Allen v. McCurry*, 449 U.S. 90, 96 (1980); *Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 988 F.2d 1480, 1487 (7th Cir. 1993).  Indiana law requires that, in order for a prior judgment to be given issue preclusive effect in a subsequent proceeding brought by the party against whom the prior judgment was entered, four conditions must be satisfied: (1) there must be a final judgment from a court of competent jurisdiction; (2) the issue must have been actually litigated; (3) the party against whom estoppel is being asserted must have had a full and fair opportunity to litigate the issue in question; and (4) it must not be otherwise unfair to preclude relitigation.  *See Infectious Disease of Indianapolis, P.S.C. v. Toney*, 813 N.E.2d 1223, 1228 (Ind. Ct. App. 2004); *Sims v. Scopelitis*, 797 N.E.2d 348, 351 (Ind. Ct. App. 2003); *Small v. Centocor, Inc.*, 731 N.E.2d 22, 28 (Ind. Ct. App. 2000); *Matter of C.M.*, 675 N.E.2d 1134, 1137 (Ind. Ct. App. 1997).

---

[12] Issue preclusion is also known as collateral estoppel and claim preclusion is also known as res judicata. *See Sullivan v. American Casualty Co.*, 605 N.E.2d 134, 139 (Ind. 1992).  Today, both Indiana and federal courts draw a distinction between issue preclusion and claim preclusion. *Alexander v. City of S. Bend*, 320 F. Supp. 2d 761, 774 (N.D. Ind. 2004).  However, many courts, both historically and presently, use the terms collateral estoppel and res judicata interchangeably as they derived from a single doctrine, res judicata. *Sweeney v. State*, 704 N.E.2d 86, 94 n.11 (Ind. 1998) (treating the terms collateral estoppel and res judicata interchangeably).  For purposes of clarification, this Court will use the terms issue preclusion and claim preclusion.

Mayes argues that the 2001 vacatur of his 1982 convictions nullifies any preclusive effect of the original judgment against him because the vacatur resulted in the absence of a final, valid judgment. In contrast, the City contends that the vacated convictions have no effect on the judgment of the Indiana Supreme Court concerning the evidence that supported Mayes' convictions. Specifically, the City argues that Mayes had a full and fair opportunity to litigate the October 6, 1980 identifications and the evidence of his "consciousness of guilt" for possible jury tampering at Mayes' criminal trial. Thus, argues the City, Mayes cannot relitigate the issue of identification evidence in this civil case.

Encouraging the Court to allow the use of issue preclusion, the City relies primarily on a single case, *Alexander v. City of South Bend*, 320 F. Supp. 2d 761 (N.D. Ind. 2004). Similar to Mayes, the *Alexander* plaintiff, convicted of attempted rape and later exonerated, brought a § 1983 action alleging a violation of his "rights, privileges, and immunities." *Alexander*, 320 F. Supp. 2d at 766. Using two independent analyses, the district court denied Alexander's § 1983 claim. First, the Court held that Alexander's claims were not cognizable under § 1983 because they focused exclusively on faulty identification procedures, failing to demonstrate the necessary link between the identification procedures and any effect they may have had on the plaintiff's criminal trial. *Id.* at 773. The *Alexander* court then denied the plaintiff's claim on an alternate ground, issue preclusion, raising the issue *sua sponte*. *Id.* at 774 n. 10. In its issue preclusion analysis, the *Alexander* court focused exclusively on the requirement of a full and fair opportunity for litigation. The court reasoned that, because Alexander could have moved to exclude evidence, had an opportunity to cross examine all witnesses, and had the opportunity to appeal the criminal trial proceedings, he had a full and fair opportunity to litigate:

82

so long as Plaintiff had a full and fair opportunity to litigate these issues at his criminal trials, he cannot attempt to relitigate those issues here . . . . Plaintiff had ample opportunity to raise these issues before the Indiana court during his trial and chose not to do so. This Court will not now afford Plaintiff another opportunity to litigate these claims. If these issues did not merit argument when the facts were fresh and the Plaintiff's liberty was at stake, they do not merit argument now when the facts are stale and the Plaintiff seeks financial compensation. This Court concludes that Plaintiff is precluded from litigating [these] issues.

*Alexander,* 320 F. Supp. 2d at 775. The *Alexander* court did not discuss the first requirement for issue preclusion, that of a final, valid judgment.

As an opinion of a fellow district court, the *Alexander* decision, while persuasive, has no binding effect on this Court. *See TMF Tool Co. v. Muller*, 913 F.2d 1185, 1191 (7th Cir. 1990) (citing *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987)). Notably, on appeal, the Seventh Circuit affirmed the *Alexander* decision exclusively on the ground of failure to raise a cognizable claim under § 1983, without addressing the district court's alternate holding on issue preclusion. In addition, the two Indiana cases relied on by the court in *Alexander* addressing the preclusive effect of a prior criminal conviction–*Kimberlin v. DeLong*, 637 N.E.2d 121, 125 (Ind. 1994), and *Doe v. Tobias*, 715 N.E.2d 829, 832 (Ind. 1999)–both dealt with final, valid judgments that had not been vacated.

Although the Court could engage in an analysis of whether Mayes had a full and fair opportunity to litigate the issue of identification, the attempt to use issue preclusion against Mayes must fail prior to that analysis because there was no final, valid judgment against Mayes. *See Ling v. Stillwell*, 732 N.E.2d 1270, 1277 (Ind. Ct. App. 2000) (quoting *Davis v. State*, 691 N.E.2d 1285, 1288 (Ind. Ct. App. 1998)) (acknowledging the requirement of a valid and final judgment for the assertion of issue preclusion). In *Starzenski v. City of Elkhart*, the Seventh Circuit recognized, "It is true that a judgment which has been reversed on its merits cannot have any claim precluding

effect." 87 F.3d 872, 878 (7th Cir. 1996) (applying Indiana law and allowing the use of issue preclusion at the appellate level). Additionally, in *Huffman v. State*, the Indiana Supreme Court found no final judgment "on the merits" when a prior criminal conviction had been vacated: "For principles of [collateral estoppel][13] to apply, there must have been a final judgment on the merits as to that issue. There has been no such final judgment as to the issue of mitigation. The original trial court judgment and sentence were reversed upon the defendant's post-conviction petition and proceedings." 717 N.E.2d 571, 575 (Ind. 1999) (internal citation omitted). In *Huffman*, the defendant was originally found guilty of murder and conspiracy to commit murder and was sentenced to death; however, during a post-conviction hearing, the court reversed all convictions and the death sentence. *Huffman*, 717 N.E.2d at 573. On remand, defendant agreed to plead guilty to murder and conspiracy to commit robbery and to testify against a co-defendant. *Id*. At his second sentencing, the defendant then attempted to use the trial court's finding from his first sentencing that his intoxication was a mitigating factor in his second sentencing hearing. *Id*. The Indiana Supreme Court held that the use of issue preclusion at the second sentencing was not proper, because, as a result of the post-conviction vacatur, the original decision was no longer final. *Id*.

Just as the *Huffman* court found a reversal based on a plea agreement sufficient to render an original trial court's decision no longer final, this Court finds that the 2001 vacatur is sufficient to render Mayes' 1982 convictions no longer final and valid. Thus, because the vacatur of Mayes' 1982 convictions resulted in the lack of a final judgment against him, the City may not use issue

---

[13] Although the Indiana Supreme Court in this case uses the term "principles of res judicata" to include the doctrine of issue preclusion, even a cursory examination of the opinion reveals that it is the issue of a mitigating factor, not the entire claim, upon which the holding is based. Therefore, in the *Huffman* opinion, the phrase "principles of res judicata" implicates the doctrine of issue preclusion, not claim preclusion.

preclusion to shield itself from relitigating the effects of the identification process on Mayes' criminal trial. The Court denies the City's motion for summary judgment on this basis.

### 2. *City Liability Under* Monell

In his response brief, Mayes represents that he is no longer pursuing his Fourth Amendment claim under § 1983 against the City. Accordingly, the Court grants summary judgment in favor of the City on Count I of the Amended Complaint. Mayes also represents that the only state law claim he is pursuing against the City is a *respondeat superior* claim for false imprisonment by Townsell. Therefore, the Court grants summary judgment in favor of the City on Counts V and VII of the Amended Complaint on all bases except for the claim based on false imprisonment by Townsell.

In Counts II and IV, Mayes alleges that the City, by and through its policymakers, created and maintained a custom, policy, or practice of deliberate indifference to the constitutional rights of citizens, by failing adequately to train, supervise, and discipline its police officers, including the individual defendants in this case to ensure that they (1) employed proper and non-suggestive identification techniques; (2) disclosed material exculpatory and impeachment information to prosecutors; and (3) disclosed to prosecutors the fact that a witness had been hypnotized. Mayes alleges that this failure to train, discipline, and supervise by the City caused him to suffer constitutional deprivations including an unfair trial and wrongful conviction. In other words, Mayes' primary theory of § 1983 liability against the City is that the HPD, beginning with Dupey and continuing through the chain of command to high ranking supervisors like Solan, maintained an official custom of failing to supervise and train detectives who were conducting the most serious

investigations that posed the greatest risk that violations of suspects' constitutional rights would occur and that, in his case, these failures led to his unfair trial and wrongful conviction.

Specifically, Mayes contends that, as a direct result of the HPD's official custom of grossly inadequate supervision and training, the individual defendants in this case were free to commit egregious and notorious violations of minimally accepted police practices, which violated Mayes' constitutional right to a fair trial through the following acts:

1) Townsell conducted impermissibly suggestive photographic identification procedures on or about October 6, 1980 by showing Ms. Jaynes photographic arrays that included, within a single array, multiple pictures of Mayes, and by repeatedly showing Ms. Jaynes arrays that included Mayes' photograph;

2) Townsell, Ratajczak, and Solan utterly failed to document or disclose to the prosecution material details of the photographic identification procedures or any of their investigative activities during the first eight months of the case, including that Ms. Jaynes made only a tentative, rather than a positive, identification;

3) Defendant Myszak, at Townsell's request, hypnotized Ms. Jaynes in part to help her identify her attackers. This hour-or-longer session and follow-up interview were never documented or disclosed to the prosecutor or the defense; and

4) Myszak, the hypnotist, subsequently conducted a live lineup procedure in which Ms. Jaynes, after first identifying another man, identified Mayes–but only after Myszak instructed her to look again and more carefully, and only after Mayes was instructed to speak and thereby revealed his false (gold) tooth.

In its motion for summary judgment, the City argues that there was no such municipal policy or custom and that Mayes cannot demonstrate that the outcome of his trial was tainted by any constitutional violation.

The Supreme Court in *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), held that "municipalities could not be liable under § 1983 on a *respondeat superior* theory, but could be liable if action pursuant to an official policy or custom of the municipality causes a constitutional tort." *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997) (citing *Monell*, 436 at 690-91; *Sivard v. Pulaski County*, 17 F.3d 185, 188 (7th Cir. 1994)). "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. An unconstitutional custom or policy can be

> (1) [A]n express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority.

*Valentine v. City of Chicago*, — F.3d —, 2006 WL 1736556, *11 (7th Cir. 2006) (quoting *Rasche v. Village of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003)). Mayes represents in his response brief that his § 1983 claim against the City is predicated solely on the second form of an unconstitutional custom or policy– a "widespread practice." *See Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006) (citing *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005)).

"Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy . . . ." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24

(1985). The Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). More specifically, the Supreme Court held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id*. at 389. Finally, the question is not simply whether the City has a training program that constitutes a policy for which the municipality is liable but rather whether the training is adequate, and if it is not adequate, whether the inadequate training can be said to represent "city policy":

> It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id*. at 390.

Nevertheless, there must also be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id*. at 385, 390. Municipal liability under § 1983 lies where a municipal policy, custom, or practice, maintained with deliberate indifference to the known or "obvious" risk of constitutional violations, causes a plaintiff's constitutional rights to be violated. *Id*. at 388-89, 390 & n.10 (1989). Causation is established when the municipal policy in question is a "moving force" behind the constitutional injury inflicted in a particular case. *Monell*, 436 U.S. at 694; *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (stating that plaintiff must show that the policy was "a moving force" or "played a part" in the constitutional violation). Mayes must demonstrate that the municipality, and not just individual employees, "made a deliberate choice

among various alternatives and that the injury was caused by the policy." *Butera*, 285 F.3d at 605 (quoting *Frake v. City of Chi.*, 210 F.3d 779, 781 (7th Cir. 2000)); *see also Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986).

Mayes alleges a widespread custom or policy within the HPD of grossly inadequate supervision and training in 1980-1982. To resolve the issue of the City's liability based on a policy or custom, the Court's focus is on the "adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390. It is not enough to show generally that the particular officers in this case–Townsell, Myszak, and Solan–were unsatisfactorily trained, that Mayes' alleged unfair trial could have been avoided had these officers been better trained, or that the officers made mistakes. *Id*. at 391. Rather, Mayes must proffer evidence that the City's failure to train and supervise these officers constituted a deliberate indifference to the constitutional rights of its inhabitants. The Court finds that Mayes has offered sufficient evidence to demonstrate such a policy or custom.

Rothlein, Mayes' expert, has testified that it was widely understood in 1980, both within the HPD and the broader law enforcement community, that full and complete records of investigative events were essential to ensure that constitutional obligations pursuant to *Brady* were fulfilled, that unconstitutional suggestion was a significant risk posed by identification procedures, and that protocols, training, and supervision in these basic investigative tasks were essential to preventing constitutional violations by law enforcement officers. Rothlein further testified that, since the 1970s, police departments attempting to follow minimally acceptable police practices required, through written protocols, training, and supervision, that their officers employ specific techniques including

creating a detailed, pre-identification victim statement, documenting all aspects of the identification procedures, and not showing a witness multiple photos arrays containing the same suspect.

These standards were created by organizations like the IACP, which Dupey testified he recognized in 1980 as an authoritative source of acceptable police practices. Dupey, the HPD chief of police, delegated all responsibility for training and supervision of the detective division to the lieutenants. In turn, Lieutenant Solan was Townsell, Ratajczak, and Myszak's direct supervisor. Solan testified that he recognized that it was essential to meticulously document the course of all photo arrays, including what the victim says about the identification, and that there should be a Q&A immediately following or within a day of the identification, which would be put into a supplemental report. Solan also understood that documentation is one of the best ways to ensure exculpatory evidence is disclosed.

However, the evidence, or lack thereof, demonstrates that HPD had no policies or protocols concerning the basic investigative tasks at issue in this case–documenting and disclosing exculpatory and impeachment evidence and conducting identification procedures. Nor was there any formal training for detectives. The City's 30(b)(6) witness testified that at the time of the investigation in this case, there was no formal training regarding conducting criminal investigations in general, or more specifically, concerning proper witness identification procedure and the documentation of criminal investigations. Although there is some evidence that Al Uzis, an alleged "legal advisor" provided "on the job training" to the HPD detectives, other evidence suggests that there was no formal training or supervision for detectives or supervisors by Uzis.

In addition to the lack of any training in the detective division, Mayes has offered evidence that the supervision of these detectives was insufficient, which then allowed the detectives in this

case to take the actions that form the basis of the alleged constitutional violation. Put differently, Townsell, Ratajczak, and Myszak could only have acted or failed to act as they did in this case in this absence of training and supervision. Dupey, the chief of police at the time, recognized that he had the ultimate authority concerning the training and supervision of criminal investigations and that it was his responsibility through the chain of command to ensure that detectives protected the constitutional rights of citizens. However, Dupey did not provide any supervision for the supervising officers of the detectives. Dupey had no idea what training, if any, was being provided to the detectives or whether the training was consistent with HPD protocols. Rather, Dupey delegated this authority to O'Drobinak, the captain over the detective division, whose role was effectively "administrative," which left Solan the discretion to run the detective division. Thus, all final policymaking concerning the HPD investigative protocols, supervision, and training were delegated to Solan.

Mayes has raised a question of fact as to whether Solan, in his role as supervisor and policymaker, provided adequate supervision and provided supervision that condoned inadequate investigative techniques. Solan did not sign off on or even review all reports in a case file, did not review all Q&As of victims in rape cases, did not sign off on reports concerning eyewitness identifications, and did not provide any direct supervision to officers with regard to how and when to conduct identification procedures, noting that it was common knowledge. For example, in the Jaynes case, although involved in the recommendation to prepare a probable cause affidavit for Mayes arrest, Solan did not conduct a review of the case file prior to an affidavit being filed. It was Solan's view that it was completely within the discretion of detectives Mak and McPhillips to act on whatever amount of evidence they believed to be sufficient for probable cause. Similarly,

Lieutenant Seaman only reviewed reports at the end of the case when he got the whole file, trusting that experienced detectives would do their jobs.

More importantly, Solan testified that, had he reviewed the Jaynes investigative file and had been aware of the conduct of the individual defendants in this case described above, he would have condoned their conduct as consistent with minimally accepted police practice and HPD protocols and to be appropriate. Both Defendants' and Mayes' experts testified that Solan's opinions in this regard were inconsistent with minimally accepted police practices.[14] Mayes is not simply alleging that Solan failed to take corrective action or failed to eliminate a practice but rather that Solan, as the effective policymaker for the City on police practices within the detective division, affirmatively condoned the investigative methods and documentation practices of the officers that resulted in the alleged constitutional deprivation.

As the Court has already found that there is insufficient evidence to infer that Myszak deliberately withheld information at his criminal proceedings deposition that he was not involved in the Jaynes investigation prior to the lineup because he did not recognize Jaynes as the person he had hypnotized, Mayes' argument that the lineup run by Myszak was tainted because Myszak was also the hypnotist is not persuasive. However, as to causation, discussed more fully below, Mayes' argument that Ms. Jaynes' identification of Mayes during the lineup was tainted by the pre-lineup

---

[14] Mayes would also have the Court consider, as evidence of a policy or custom of the HPD in 1980, the actions and beliefs of the current Hammond chief of police as a ratification of the events that occurred more than twenty years earlier. The Seventh Circuit has held that in some circumstances subsequent conduct taken by municipal officers may be used to prove a preexisting disposition and policy. *See Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987), vacated on other grounds, 835 F.2d 122 (7th Cir. 1988) (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir.1985)); *see also Keys v. City of Harvey*, No. 92 C 2177, 1996 WL 34422 (N.D. Ill. Jan. 26, 1996). However, the subsequent conduct in all of those cases occurred shortly after the alleged constitutional violation and, importantly, the conduct, or lack thereof, was by the same officials involved in the alleged constitutional violation or by the supervisors of those officials at the time of the incident. The Court declines to extend this principal to the actions and beliefs of a policymaker twenty years removed from the incident in question and with no personal involvement in those events.

events, specifically, the alleged improper October 6 identifications, the subsequent hypnosis, and then the November 17 identification, and that her "positive" identification at the lineup is one more element tainting her in-court identification of Mayes is persuasive.

Although Mayes has a high hurdle to clear in demonstrating municipal liability under § 1983 and more specifically for a failure to train, based on these facts and without weighing testimony or considering the credibility of witnesses, Mayes has offered sufficient evidence that the HPD had a widespread policy or custom of failing to train its detectives in minimally acceptable police practices and of failing to supervise such that the City had not adopted an adequate policy regarding the preservation and production of exculpatory evidence. In light of the duties of officers in relation to investigations such as taking witness and victim statements and conducting photo arrays, the need for training in proper identification procedures to ensure against unduly suggestive identification procedures and in proper documentation to ensure that exculpatory evidence makes its way to the prosecutor is clear. This need for adequate training in these areas was so clear that the failure to provide the training can properly be characterized as deliberate indifference to constitutional rights. In addition, the policy of the lieutenants, including Solan, who were effectively given the final policymaking authority in the HPD for the detectives, was a hands-off approach by which the detectives were given the freedom to conduct their investigations and seek probable cause affidavits as the detectives saw fit, with insufficient supervision or intervention by the lieutenants to ensure that constitutional rights were being protected.

Contrary to the City's argument, Mayes has offered more than a "single incident" of unconstitutional conduct in support of his claim. The emphasis of the City's motion for summary judgment and reply brief is that the City did not have a policy or custom of allowing hypnosis in

investigations, that the single incident of hypnosis in this case cannot be attributed to the City under *Monell*, and that the hypnosis did not cause a constitutional violation because the prehypnosis identification on October 6 was sufficient to support Mayes' conviction. Incorrectly, the City makes this argument on the assumption that Mayes would be precluded from relitigating the October 6 pre-hypnosis identifications. As the Court has found that there is no longer a final, valid judgment on which to base collateral estoppel, Mayes is not precluded from arguing that the October 6 identification was unduly suggestive and/or tentative. Moreover, multiple instances of alleged unconstitutional conduct occurred during the course of the Jaynes investigation by Townsell, Ratajczak, Myszak, and Solan. *See, e.g., Woodward v. Correctional Med. Servs. Of Illinois*, 368 F.3d 917, 929 (7th Cir. 2004) (finding "more than a single instance of flawed conduct" in light of "repeated failures" with respect to one individual "as well as a culture that permitted and condoned violations of policies").

Mayes has also demonstrated causation by linking the underlying constitutional violations, the failure to disclose *Brady* material that led to an unfair trial–the constitutional injury caused by the suppression–to the policy and custom of the HPD. As set forth above and in the fact section, the experts and HPD officers have testified that the key to ensuring disclosure of *Brady* material is requiring thorough documentation of the investigative activities in a case. In this case, there was no pre-identification statement taken by Townsell in the days following October 5, no documentation by Townsell of the October 6 identification, no documentation or disclosure by Townsell or Solan that the October 6 identification was tentative, no documentation of the hypnosis session by Townsell, Ratajczak, or Myszak, and no documentation of the December 1980 interview with Bertha Allen until six months later. In addition, Solan has testified that the actions taken by

the investigators in this case were consistent with minimally accepted police practices and HPD protocols. It was within this environment created by the supervision or lack thereof of the lieutenants along with the lack of training and written protocols that the failure to disclose exculpatory evidence took place in this case. Mayes describes this as a "climate of impunity" in which detectives knew that the chain of command would either never detect or would actively condone their investigative practices. Pl. Br., p. 32. The Court finds that Mayes has raised sufficient triable issues of fact that the City's practice or custom was a "moving force" behind Mayes' constitutional deprivations.

Similarly, Mayes has raised a triable issue of fact as to whether his trial was unfair, in that he has brought into question whether the verdict in his criminal case is worthy of confidence based on the October 6 identification, the hypnosis, and the subsequent identifications and the exculpatory evidence that was suppressed related to those events. Although the City characterizes the October 6 identification as positive, Mayes is not collaterally estopped from arguing that the identification was both suspect and tentative based on the evidence of record. Both facts were suppressed during the criminal trial. As for the City's argument that the identifications were anything but entirely proper, Mayes has offered evidence that multiple pictures of Mayes were shown within one photo array on October 6, that Ms. Jaynes was shown pictures of Mayes on more than one occasion on October 6, and that Townsell described the identification as "tentative" to Solan in the days following October 6, all of which raises a triable issue of fact as to the nature of the October 6 identifications. The confidence in Mayes' convictions is then brought into question as Vanes has testified and the Indiana Supreme Court stated in affirming Mayes' convictions that, without the identifications in this case, the evidence of Mayes' attempt to influence a juror would not have been

admitted in his second criminal trial as "probative of consciousness of guilt." In addition, the City's

argument that there was an independent basis for Ms. Jaynes' identification of Mayes prior to the

hypnosis based on the October 6 identification and thus that evidence of the hypnosis session cannot

be used to undermine the conviction under the applicable law at the time, again relies on the

assumption that the October 6 identification was positive and that Mayes is collaterally estopped

from litigating that identification, which the Court has held Mayes will be allowed to challenge at

trial. Of course, Mayes will be free to argue at trial that the hypnosis was in fact a hypnosis, rather

than a relaxation session as asserted by Myszak, and the effect that such a session had on Ms.

Jaynes' identifications of Mayes and, thus, on the fairness of his trial and convictions.


### 3. State Law False Imprisonment

In Counts V and VII of the Amended Complaint, Mayes has brought a *respondeat superior*

claim against the City for false imprisonment based on the actions of Townsell. In its motion for

summary judgment, the City argues that Mayes' state law claims must fail because probable cause

existed to arrest him. Mayes responds that his false imprisonment claim is not based on his arrest

but rather on his imprisonment flowing from his alleged wrongful conviction and, therefore, that the

probable cause analysis is unnecessary.

Under Indiana law, a plaintiff may recover damages for false imprisonment if the plaintiff

can "prove that the conviction or sentence has been reversed on direct appeal, expunged by

executive order, declared invalid by a state tribunal authorized to make such determination, or called

into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Scruggs*

*v. Allen County/City of Fort Wayne*, 829 N.E.2d 1049, 1051 (Ind. Ct. App. 2005) (quoting *Heck v.*

*Humphrey*, 512 U.S. 477, 486-487 (1994)) (holding that the federal standard under § 1983 applies to a state false imprisonment claim under Indiana law but finding that the plaintiff was not entitled to damages because his conviction had not been overturned).

Although Mayes is correct that his cause of action for false imprisonment may flow from his wrongful conviction, he has not offered a different standard for false imprisonment other than the standard in Indiana: "False imprisonment is the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002) (citing *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 967 (Ind. Ct. App. 2001)). "A defendant may be liable for false arrest when he or she arrests the plaintiff in the absence of probable cause to do so." *Id.* (citing *Conwell v. Beatty*, 667 N.E.2d 768, 775 (Ind. Ct. App. 1996)). The courts in Indiana treat false arrest and false imprisonment interchangeably. *See Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003); *see also Garrett v. City of Bloomington*, 478 N.E.2d 89, 93 (Ind. Ct. App. 1985).[15] Similarly under the federal standard, "[p]robable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006).

---

[15] Although the terms are often used interchangeably, false arrest and false imprisonment can be distinct causes of action in that a false imprisonment claim can be made absent an arrest. *Row v. Holt*, 834 N.E.2d 1074, 1088-89 (Ind. Ct. App. 2005) (citing *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 967-68 (Ind. Ct. App. 2001)). The following general explanation is instructive:

> The terms "false arrest" and "false imprisonment" are virtually synonymous, and are sometimes considered to be the same tort. A false arrest is one means of committing a false imprisonment, and every false arrest has, at its core, a false imprisonment . . . . [A] distinction has been drawn between false arrest and false imprisonment in that a false arrest must be committed under assumption of legal authority whereas a false imprisonment may be committed without any pretense of legal authority.

*Id.* (quoting 35 C.J.S. False Imprisonment § 3 at 435-36 (1999) (footnotes and citations omitted)). However, the distinction drawn along this line is not applicable in the instant matter as the alleged false imprisonment was committed under the pretense of legal authority.

In support of his argument that the hypothetical existence of probable cause to arrest does not insulate the defendants from misconduct in securing Mayes' wrongful conviction and subsequent imprisonment, Mayes cites two federal cases holding that, under constitutional principles for the purposes of a § 1983 action, there is no distinction between the falsifying of evidence to facilitate a wrongful arrest or, subsequently, falsifying evidence to induce prosecutors to initiate an unwarranted prosecution. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1296 (10th Cir. 2004); *Ricciuti v. NYC Transit Auth.*, 124 F.3d 123, 129-130 (2d Cir. 1997). However, these cases specifically distinguish between the body of law relevant to common law torts and federal standards, explaining that the former may provide informative analogy for federal causes of action but that the latter are dispositive. Mayes has offered no legal analysis under Indiana state law in support of his claim for false imprisonment against the City based solely on actions taken by Townsell following his arrest.

Under Indiana law in 1980, "[t]he test for probable cause to make an arrest is whether at the time of the arrest the facts and circumstances within the knowledge of the officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man of reasonable caution in believing that the arrestee had committed or was committing an offense." *Smith v. State*, 271 N.E.2d 133, 136 (Ind. 1971). Even if an underlying fact upon which the officer's assumptions is later proven untrue, this will not alter the existence of probable cause to arrest. *Riggenback v. State*, 397 N.E.2d 953, 955 (Ind. 1979). "Probable cause is normally an issue for the jury's determination." *Street v. Shoe Carnival, Inc.*, 660 N.E.2d 1054, 1056 (Ind. Ct. App. 1996) (citing *Duvall v. Kroger Co.*, 549 N.E.2d 403 (Ind. Ct. App. 1990)).

In this case, an Affidavit for Probable Cause was issued on January 9, 1981 in Mayes' criminal case. In the Affidavit, Ms. Jaynes sets forth a brief description of the events of the robbery

and rape of October 5, 1980, and, in the closing paragraph, provides: "I viewed a photographic display at the Hammond Police Station and positively identified a photograph of Larry Mayes as being a photograph of the shorter of the two (2) men mentioned above." Pl. Br., Exh. 00. The City argues that Ms. Jaynes' identification of Mayes on October 6, 1980, created probable cause for arrest, asserting that in some cases, less evidence than an identification in a photographic lineup can provide probable cause.[16] In addition, under the law at the time of the events in question, evidence obtained from hypnosis was admissible for a determination of probable cause. *Gentry v. State*, 471 N.E.2d 263, 267 (Ind. 1984). However, there are genuine issues of fact regarding the suggestive and tentative nature of the October 6 identification, which, if a jury were to find to have been unduly suggestive and tentative, may have affected the hypnosis and any subsequent identifications, all of which occurred prior to the execution of the Affidavit for Probable Cause. Accordingly, the Court finds that the determination of probable cause in the context of the state law false imprisonment claim must be decided by the jury, and the Court denies the City's motion for summary judgment on Counts V and VII of the Amended Complaint.

### F. Motion for Summary Judgment–Frank Dupey

*1. Supervisory Liability*

As with Solan, Mayes has sued Frank Dupey, the former Chief of Police of the City of Hammond, in Count III of the Amended Complaint on a theory of supervisory liability under § 1983. Dupey argues that he is entitled to summary judgment because Mayes produces no material evidence

---

[16] The City also argues that Mayes' prior convictions were the type of convictions utilized by police at the time to determine probable cause to arrest. However, there is no evidence of record that Mayes' prior convictions played any role in the decision to arrest Mayes.

that Dupey was deliberately indifferent in the supervision of Solan, Townsell, or Myszak or was personally involved in the alleged unconstitutional acts. In response, Mayes asserts that summary judgment is improper because, as the City's final policy maker on supervision, training, and protocol for the HPD, Dupey both condoned and actively facilitated the alleged unconstitutional conduct of Solan, Townsell, and Myszak. Specifically, Mayes argues that Dupey established no mechanism for supervision of his appointed police captains or the training received by detectives in the Hammond Police Department, which directly resulted in the alleged constitutional violations.

As with Solan, Mayes has asserted his claims against Dupey in both his official and individual capacities while also naming the City as a defendant. Although the claim against Dupey in his official capacity is nothing more than a claim against the City, the claim may nevertheless go forward against Dupey in his individual capacity.

As set forth in more detail in Part D.2 regarding Solan's supervisory liability, the Supreme Court has expressly rejected *respondeat superior* as a basis to attach supervisory liability under a § 1983 action, *see Monell*, 436 U.S. at 691-92, and a supervisor may not be held liable unless he caused or participated in the alleged constitutional deprivation. *See Galdikas*, 342 F.3d at 693. Again, proof of negligence or even gross negligence is insufficient: "The supervisor must know about the conduct and facilitate it, condone it, or turn a blind eye for fear of what they might see. They must act either knowingly or with deliberate, reckless indifference." *Jones*, 856 F.2d at 991. Upon a failure to take corrective measures, despite being on notice of the unconstitutional acts, liability may attach. *See Wilson*, 6 F.3d at 1240. However, isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference. *See Tuttle*, 471 U.S. at 823-24.

It is uncontested that Dupey, as chief of police, was the individual within the HPD with ultimate authority concerning the training and supervision of criminal investigations. Dupey was also responsible for ensuring that detectives received adequate training, including training in constitutionally adequate law enforcement practices concerning hypnosis, identification procedures, and the production of exculpatory evidence. Notwithstanding these duties, Dupey did not engage in any direct training or supervision of Solan, Townsell, or Myszak with regard to witness identification, report writing, hypnosis, or interrogation procedures. In fact, Dupey gave O'Drobinak, the captain responsible for all detective work, full discretion to run the detective division as he saw fit and provided no direct oversight over O'Drobinak or the detective division. In turn, O'Drobinak gave his lieutenants, Solan and Seaman, complete discretion concerning the manner in which they supervised investigations. Dupey has no recollection of the Jaynes case, does not recall having any problems of any kind in the detective bureau while he was Chief, and has no knowledge of whether hypnosis has ever been used in the HPD. In sum, during the time he was chief, Dupey had only a minimal role as a supervisor, knew nothing of the workings of the detective bureau, and was never made aware of any possible constitutional violations therein.

Mayes admits that Dupey lacks actual knowledge of and did not directly participate in the alleged constitutional misconduct of his subordinate detectives; rather, Mayes argues that Dupey's admitted abdication of his supervisory responsibilities amounted to a policy or custom that directly led to the alleged constitutional violations. For support, Mayes relies on the First Circuit decision in *Maldonado v. Rodriguez*, which held that: "[notwithstanding his] lack[] [of] actual knowledge of censurable conduct, he may be liable for foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and

authority to alleviate it." 23 F.3d 576, 582 (1st Cir. 1994). Thus, Mayes argues that, in abandoning his specific job duties, Dupey removed a critical safeguard that he was responsible for providing in order to ensure that constitutional violations by the law enforcement officers under his command did not occur.

While Mayes' argument is persuasive, and Dupey's complete delegation of responsibilities was poor police practice, neither negligent supervision of subordinates nor dereliction of duty, without more, rise to the level of deliberate indifference necessary to establish supervisory liability under current Seventh Circuit law. *See Wilson*, 6 F.3d at 1240-41. In *Wilson*, the Seventh Circuit held that supervisory liability could not be placed on the police superintendent because, in response to repeated complaints of police brutality, the superintendent did not engage in conduct recognizable as a "personal deliberate wrongdoing." *Id.* at 1240. In fact, the superintendent referred the complaints to a unit within the department responsible for investigating police abuses. *Id.* The court stated:

> It was the plaintiff's responsibility to show that in [referring the complaints the superintendent] was not acting in good faith to extirpate the practice. That was not shown. At worst, the evidence suggests that [the superintendent] did not respond quickly or effectively, as he should have done; that he was careless, maybe even grossly so given the volume of complaints. More was needed to show that he *approved* the practice. Failing to eliminate a practice cannot be equated to approving it. Otherwise every inept police chief in the country would be deemed to approve, and therefore become answerable in damages to all the victims of, the misconduct of the officers under his command-indeed might be deemed responsible for all the murders and robberies that he had through his carelessness failed to prevent.

*Wilson,* 6 F.3d at 1240 (citations omitted).

Unlike the superintendent in *Wilson*, Dupey was never made aware of the alleged unconstitutional activities of his subordinates. In fact, this was the first and, as far as the record illustrates, only incident of possible hypnosis conducted within the HPD. Also, Dupey states, and

Mayes admits, that Dupey had no knowledge of the detective bureau's inner workings. Thus, in contrast to the superintendent in *Wilson*, no reasonable jury could infer that Dupey was on notice of possible constitutional violations within the detective bureau. Even if he were, *Wilson* requires Dupey to have *approved* of the practice through a personal, deliberate act. As Dupey had no notice of the alleged violations, logic dictates that he could not have deliberately sanctioned the unconstitutional activity.

Further, there is no evidence of a large pattern of known constitutional violations that would have alerted Dupey that the lack of training constituted a policy leading to the deprivation of constitutional rights. In hierarchical organizations such as the HPD, executives delegate authority to subordinates who are charged with the supervision of daily activities. Dupey testified that, during his time as chief, he assumed that the subordinate officers were conducting all of the necessary training within the detective bureau. Before becoming chief, Dupey had no supervisory experience or responsibilities, had never supervised a single police officer, had never worked as a detective, and had never investigated a rape or homicide. In fact, Dupey acknowledged that he was not qualified to directly supervise detectives and thus had to rely completely on the captains and lieutenants to ensure proper functioning of the detective bureau. Nothing in the evidence suggests that Dupey was ever informed of a need for additional training within the detective bureau. Therefore, no reasonable jury could conclude that he was on notice of the alleged violations due to a lack of training.

The evidence suggests that Dupey was grossly careless in his duties; however, the Seventh Circuit mandates that dereliction of duty does not constitute deliberate indifference. Accordingly, because Mayes has not submitted evidence that Dupey knew about the unconstitutional conduct and facilitated it, condoned it, or turned a blind eye to it for fear of what he might have seen, he has

failed to prove that Dupey acted with deliberate or reckless indifference. Therefore, summary judgment is appropriate on Mayes' supervisory liability claim against Dupey in Count III of the Amended Complaint.

### 2. Qualified Immunity

Dupey argues that he is entitled to qualified immunity on Mayes' *Brady* claims. As set forth in Part C.2 and Part D.1.d above, the qualified immunity inquiry is two-fold. First, the Court inquires whether, when taken in the light most favorable to Mayes, the facts alleged show that Dupey's conduct violated a constitutional right. *Crull*, 384 F.3d at 460. Second, the Court must determine if the right was clearly established at the time of the violation. *Id*. The Court has found that Dupey has not violated Mayes' constitutional rights, and, thus, the Court need not turn to the second step of the analysis.

### 3. State Law Claims–Indiana Tort Claims Act

Mayes is no longer pursuing his state law claims against Dupey. Accordingly, the Court grants summary judgment in favor of Dupey on Mayes' state law claims in Counts V and VI.

### CONCLUSION

Based on the foregoing, the Court now:

(1) **DENIES** Defendants' Motion to Strike the Plaintiff's Response Brief to the Defendants' Motion for Summary Judgment and the Plaintiff's "Appendix A" [DE 190];

(2) **DENIES** Defendant Detective Sgt. Raymond Myszak's Motion to Strike the Plaintiff's Response Brief to Defendant's Motion for Summary Judgment and the Plaintiff's Appendix A [DE 194];

(3) **DENIES** Defendants Detective Michael Solan and Former Police Chief, Frank Dupey's Motion to Strike the Plaintiff's Response Brief to Defendants' Motions for Summary Judgment and the Plaintiff's Appendix A [DE 196];

(4) **GRANTS in part** and **DENIES in part** Defendant's Second Motion to Strike as to the Plaintiff's Response to the Defendant's Motion for Summary Judgment and the Plaintiff's "Appendix A" [DE 211];

(5) **GRANTS in part** and **DENIES in part** Defendant Detective Sergeant Raymond Myszak's Second Motion to Strike as to the Plaintiff's Response Brief to Defendant's Motion for Summary Judgment and the Plaintiff's Appendix A [DE 217];

(6) **GRANTS in part** and **DENIES in part** the City's Motion for Summary Judgment [DE 118];

(7) **GRANTS** Defendant Detective Sgt. Raymond Myszak's Motion for Summary Judgment [DE 121];

(8) **GRANTS** Dupey's Motion for Summary Judgment [DE 132];

(9) **GRANTS in part** and **DENIES in part** Solan's Motion for Summary Judgment [DE 134]; and

(10) **DENIES as moot** Plaintiff's Motion for Oral Argument of Defendants' Motions for Summary Judgment [DE 186].

The following claims remain pending for trial: (1) 42 U.S.C. § 1983 Fourteenth Amendment denial of fair trial claim in Count II against Solan and the City of Hammond; (2) 42 U.S.C. § 1983 supervisory liability claim in Count III against Solan; (3) 42 U.S.C. § 1983 *Monell* claim in Count

IV against the City of Hammond; and (4) state law false imprisonment in Counts V and VII against the City of Hammond based on the actions of Townsell.

SO ORDERED this 5th day of July, 2006.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:  All counsel of record